**Hazel I. BROOKS, on her own behalf and as Next Friend for Michael Keith Brooks, et al., Appellant,**

v.

**Raymond C. ENGEL, d/b/a Cold Wave Tavern, Appellee.**

**No. 55350.**

Supreme Court of Iowa.

April 25, 1973.

Newport, Newport & Wine, Davenport, for appellant.

McDonald & McDonald, Davenport, for appellee.

REYNOLDSON, Justice.

After a whiskey and beer drinking bout which extended the full night of July 29-July 30, 1966, and into the following day, Roland Brooks was drowned while fishing from a small boat in the Mississippi River at about 2:00 p. m. on July 30th. His wife, plaintiff here, in her own behalf and as next friend for their four minor children (ages 9 through 14) filed this dram shop action against defendant Raymond C. Engel. Engel operated the Cold Wave Tavern where Brooks spent much of his drinking time the night before and returned to consume his last beer about two hours before his death.

At approximately 11:30 a. m. on the morning of the drowning Brooks and Orville Martinson by prearrangement met their employer, Jack Jessee, at the Cold Wave Tavern, to go fishing in Mr. Jessee's boat. Orville Martinson had been Brooks' all-night drinking companion and had returned with Brooks to the latter's home at about 8:30 a. m. for further beer drinking. Mr. Jessee testified all three men had a small beer in the tavern and went to the river. About two in the afternoon Martinson stood up in the boat to relieve himself and fell overboard. Brooks removed his shoes and dove in after him. Both men drowned on the Illinois side of the river.

At trial Jessee testified in his opinion neither Martinson nor Brooks were intoxicated when he took them out in his boat, and that no intoxicants were consumed in the boat before the drownings. He was the sole witness to the tragedy.

Brooks' body was recovered from the river in the early morning hours of July 31. James L. Shaw, Rock Island County (Illinois) coroner, had the body taken to Knox Larson Funeral Home, Rock Island, Illinois. Plaintiff testified when she arrived at the funeral home that morning she authorized an autopsy and assumed there would be a blood test. Coroner Shaw testified he ordered a blood specimen taken by the mortician, Lewis R. Jenks, and described his delivery of the specimen to a pathologist's laboratory for testing. The test produced a result of 260 milligrams of alcohol per one hundred c.c. of blood, shown in the record to indicate a definite state of intoxication.

This blood test, plaintiff asserts, furnishes the only direct evidence her decedent was intoxicated when he drowned and is crucial to her case. Admissibility of the test is, of course, the storm center of this appeal.

■ I. Because of the unique manner this case was tried below, it presents unusual problems here. Plaintiff grounded her action on both sections 129.2 and 123.-95 of the 1966 Code of Iowa. Before commencement of the first aborted jury trial, district court dismissed all of that portion of the petition relating to § 129.2, The Code, 1966, for the reason that section had no extraterritorial jurisdiction and effect. Because plaintiff's petition failed to state the injury to have occurred in the state of Iowa, trial court reasoned the petition stated no cause of action. This ruling is raised as error by plaintiff, who argues even though the drowning occurred on the east side of the Mississippi, both states had

concurrent jurisdiction of the river area by reason of § 1.3, The Code, 1966. Defendant concedes trial court's error in this holding. Upon oral submission plaintiff's counsel conceded this would not be prejudicial in the event trial court was correct in rejecting the blood test and finding there was not sufficient evidence of Brooks' intoxication at time of his death.

II. Apparently plaintiff did not learn of the Illinois blood test until shortly before the first trial commenced. Some testimony was introduced concerning this test before trial court concluded the evidence should not have been admitted and declared a mistrial before plaintiff had rested.

The matter again came to trial on March 1, 1971. Defendant filed a motion in limine which was obviously treated by the trial judge as a motion to suppress all blood test evidence. Plaintiff raises no issue on use of the limine motion for such broad purpose. But see Lewis v. Buena Vista Mutual Insurance Association, 183 N.W.2d 198 (Iowa 1971). Although there is no showing in this record there was any evidence then before the court to support its action, the motion was sustained. The parties then stipulated the jury should be dismissed and the matter submitted to the court for decision. It was further stipulated the case would be decided upon the transcript of evidence at the first trial and offers of proof by plaintiff relating to the blood test, which should be considered by the court as having been offered prior to his ruling on the limine motion and as evidence in the trial itself but for the pre-trial inadmissibility ruling.

Two questions (other than the conceded error above referred to) thus remain: 1) Was the foundational showing sufficient under the Iowa law to permit the blood test result to be admitted into evidence for consideration by the fact-finder? 2) If foundationally inadequate under the Iowa law but adequate under the Illinois law, should the test result have been admitted in the Iowa trial? We treat these issues in reverse order.

III. Defendant only perfunctorily resists plaintiff's claim the result of the blood alcohol test would have been admissible in Illinois litigation. However, plaintiff has difficulty in sustaining her position this evidence, for that reason alone, should be admitted by an Iowa court.

■ We have said where the incident giving rise to a cause of action occurs in a foreign state, the rights and liabilities of the parties must be determined by the foreign state's laws in whatever court the action is brought, but that procedural matters and matters pertaining to the remedy to be applied must be determined by the law of the forum. Kingery v. Donnell, 222 Iowa 241, 268 N.W. 617 (1936); Dorr Cattle Co. v. Des Moines Nat. Bank, 127 Iowa 153, 98 N.W. 918 (1904).

■ Even granting the present state of uncertainty and flux in the conflict of laws arena, we cannot follow plaintiff's logic. She grounds her cause of action on two Iowa statutes, yet argues Illinois law should apply to a portion of the proof of her decedent's intoxication. With few exceptions unnecessary to consider here, the local law of the forum determines the admissibility of evidence. Restatement (Second) of Conflict of Laws § 138, p. 384. We hold Iowa law applies. There is no merit in this assignment of error.

IV. It is equally as difficult for us to accept defendant's dogmatic rationale this evidence was inadmissible for foundational inadequacy because the nine steps set out in Lessenhop v. Norton, 261 Iowa 44, 153 N.W.2d 107 (1967) were not followed. This view, which formed the actual basis for trial court's exclusion of this evidence, wholly ignores that in setting out the nine-point foundational rule (261 Iowa at 52–53, 153 N.W.2d at 112) for admission of blood test evidence, *Lessenhop* had under discussion a contention that chapter 321B, The Code, applied. We are not here concerned with the restrictions of that chapter (chemical testing for intoxicated drivers) and cases based on its language.

We are confronted with the reliability of a blood alcohol test conducted on a blood specimen recovered from the body of a person who met death by drowning, unconnected with any motor vehicle episode. Brooks was not driving nor was he even on a highway. The implied consent provisions of chapter 321B are not involved.

The issue is whether under Iowa general rules of evidence plaintiff in this civil case has laid proper foundation for admission of an alcohol test result on a blood specimen taken from her drowned decedent. The case below was, as a practical matter, decided as a matter of law, trial court holding, on the basis of largely uncontroverted evidence, three of the chapter 321B criteria set out in *Lessenhop* at 261 Iowa, page 52, 153 N.W.2d, page 112, were not satisfied.

■ We hold the trial court erred in applying the nine-point *Lessenhop* formula. Those standards control only in cases, both civil and criminal, arising under chapter 321B circumstances, as the following language from that opinion shows:

"Chapter 321B clearly relates to the authority to take blood tests when a person is suspected of driving while intoxicated * * *." 261 Iowa at 52, 153 N.W.2d at 112.

*Lessenhop* also recognizes this distinction at page 51 of the Iowa Reports and page 111 of the Northwestern by reciting the generally accepted rule for laying a proper foundation before a blood test analysis may be received. It is only when we relate the general rule to the requirements of § 321B.4 that the nine-point foundation formula is either mentioned or mandated.

We must therefore review the facts relative to these tests in the light of our rules on the admissibility of such evidence without reference to the inapplicable nine-point standards set up in *Lessenhop*. Those facts, lifted from the first-trial testimony and plaintiff's further offers, are virtually uncontroverted.

As we have indicated, the blood was withdrawn from the decedent by mortician Lewis R. Jenks, at the request of the Rock Island County, Illinois, coroner. Jenks was at all relevant times an Illinois licensed embalmer. In 1942–43 he attended a mortuary science school in Chicago, there studying anatomy, physiology, pathology, chemistry, embalming and funeral directing. In the spring of 1943 he passed the Illinois licensing examination in embalming, funeral directing, pathology, chemistry and public health. After being licensed he served in the army medical corps in the Pacific and South Pacific areas until his discharge in 1946. Thereafter he worked continously as a mortician.

In the course of his years as an Illinois mortician Jenks had drawn from cadavers numerous blood specimens for alcoholic testing. In the four years prior to trial he had drawn approximately 480 blood samples. These samples were taken by making an incision approximately three inches long in either the jugular vein or the carotid artery, and inserting the container directly into the cavity so that it did not come into contact with any part of the outside surface of the body. In a case such as this, certain built-up gases cause the blood to flow freely into the container. This method, used here, is in accordance with directions he had received from medical doctors when drawing blood samples in their presence, including Dr. Rollin Perkins, the Scott County, Iowa, medical examiner. His techniques have never been questioned by any doctor when doing an autopsy or otherwise and his blood specimens have been uniformly accepted and never rejected.

The blood container carried an anticoagulant and was a small glass vial with a rubber stopper. Coroner Shaw's given and offered testimony was that these vials are furnished him by the state of Illinois. They are sterile and in hermetically sealed cans, about 50 to 75 vials per can. Each vial is fitted with a rubber stopper so that nothing can reach the inside until the stop-

per is removed for the purpose of taking the blood sample. In this particular case the can had been unsealed but the rubber seal on the vial he furnished Jenks for the sample had not been tampered with, jarred, or loosened.

Plaintiff offered to prove by Jenks that he never opened the vial until he actually drew the blood sample. He then replaced the rubber stopper, marked the vial with the name of the deceased, and refrigerated the specimen until it was picked up the next day by Shaw.

Plaintiff offered Shaw's testimony that as coroner he conducted an inquest into decedent's death and as part of the inquest the test result on the blood of Roland Brooks was recorded as .26 percent or 260 milligrams of alcohol per 100 c.c. of blood.

Defendant stipulated Dr. Charles B. Preacher is a medical doctor, duly qualified pathologist, and expert in the field of pathology and medicine. Plaintiff offered to show by his testimony he was a member of the Quad-City Pathologist's Group. He and his associates do a considerable amount of work in Scott County, Iowa, and also in Rock Island County, Illinois. Further (by stipulation), in response to a properly worded hypothetical question including the relevant facts of the offered testimony of Jenks and Shaw, Dr. Preacher would testify that in his opinion Brooks' blood was drawn and the test performed in accordance with the customs, practices and procedures in Rock Island County, Illinois. Plaintiff's proffer included the facts this specialist is familiar with the blood sampling procedure often followed in funeral homes and by morticians in making an incision above the jugular vein or carotid artery and of inserting a vial or tube directly into the blood as it flows from said vein or artery, this is a sound medical practice and procedure which will not adversely affect the blood test to be made on the blood sample so collected, and there is no reason why blood cannot be so collected insofar as medical standards are concerned. It was

further offered this witness would testify he was familiar with the anticoagulant used in these vials and this substance would not affect the alcohol test but in fact such use is in accordance with good medical practice and procedure.

Plaintiff offered to prove by this witness that alcohol in the blood of a living person does dissipate through various means, but alcohol in the blood of a deceased person does not dissipate, and blood drawn from a corpse up to 36 hours after death would accurately reflect the alcoholic content of the blood at the time of death.

It was stipulated if other named medical experts were called they would testify to the type and result of the test and that this test would show within reasonable medical certainty decedent was intoxicated at time of death. We do not set out the details of these proffers because the test result is not in controversy.

We now examine the evidence above summarized in light of the general rule set out first in the *Lessenhop* opinion to determine if a proper foundation was in fact made or offered. Specifically, we examine the three foundational defects asserted by this defendant, upon which trial court grounded its ruling on the motion in limine.

■ V. Defendant first asserts the blood specimen was not timely taken. Obviously, the sample was not drawn within the two hours prescribed by § 321B.3, The Code, 1966. But as that section is inapplicable here, the real issue is whether that sample, taken about 21 hours after decedent drowned, would, upon proper testing, accurately reflect the alcoholic content of decedent's bloodstream at time of death. Of course, this is a proper subject of expert scientific opinion. The only evidence on this point was plaintiff's offered testimony of Dr. Charles Preacher, stipulated to be a medical doctor and expert in the field of pathology and medicine. We have set out above his opinion the test results

would be unaffected by this time delay. Assuming, without deciding, timeliness of sampling was plaintiff's foundational burden under the general rule, we hold that burden was met.

■ VI. Defendant next contends there was no proper foundation laid because a mortician drew the blood sample and not a licensed physician, medical technologist or registered nurse, being those statutorily authorized persons specified in § 321B.4 and incorporated in the second nine-point rule found in *Lessenhop*. In suppressing the blood test result trial court, referring to the "nine specific points" in *Lessenhop*, held "there was no showing that the withdrawal was by an authorized person." It is apparent to us trial court was referring to one of the three persons named in the implied consent law.

Again, we are not concerned with the second nine-point rule but only the first general rule in *Lessenhop* which refers to an "authorized *person.*" Mortician Jenks was clearly authorized and directed by the county coroner to draw this blood specimen. Plaintiff authorized an autopsy. This evidence is offered by plaintiff, who, with the coroner, were the two people on the scene obviously empowered to authorize Jenks to draw the blood. See Jacobsen v. International Transport, Inc., 391 F.2d 49 (8 Cir. 1968); cf. Diener v. Mid-American Coaches, Inc., 378 S.W.2d 509 (Mo.1964).

The real issue, from a foundation standpoint, is whether Jenks was a qualified person to take a careful sampling of blood. Trial court made no finding as to this and apparently gave it no consideration, believing that only those persons named in § 321B.4 were authorized under any circumstances to draw blood samples. We have already referred to the education, lengthy training and experience of this mortician in drawing samples for blood alcohol testing. We have considered the offered testimony of the expert, Dr. Preacher, that this specific test was performed in accordance

with the medical customs, practices and procedures in Rock Island County, Illinois, it is a sound medical practice and procedure, it will not adversely affect the test result, and there is no reason why blood for testing cannot be so collected insofar as medical standards are concerned. This proffered evidence was not controverted by any expert evidence from the defense.

Defendant, confident the chapter 321B restrictions apply here, relies on only one authority where a blood sample drawn by a mortician was rejected, Gard v. Michigan Produce Haulers, 20 Mich.App. 402, 174 N.W.2d 73 (1969). *Gard* involved a vehicular collision and the implied consent law was in issue. The Michigan statute is almost identical to our § 321B.4, and names the same personnel as authorized to draw the blood specimen. The patrolman requested the mortician to draw the blood sample. The test by one not named in the Michigan implied consent statute was rejected by the Michigan court, which additionally observed, "[T]hat a blood sample taken by a mortician does not have the inherent reliability essential for this purpose, owing to his lack of training and experience in properly taking and preserving blood components." This finding is contrary to the finding which should logically be made on proof in the instant litigation.

Other jurisdictions appear to accept an experienced mortician as qualified to draw reliable blood specimens from cadavers. Webb v. Stone, 445 S.W.2d 842 (Ky.1969); Hoffman v. Tracy, 67 Wash.2d 31, 406 P. 2d 323 (1965); cf. State v. Daly, 210 Mo. 664, 109 S.W. 53 (1908). We hold under the record in the civil case before us (not involving chapter 321B) Jenks was shown to be foundationally qualified to draw Brooks' blood.

■ VII. Lastly, defendant contends Jenks did not use proper sterile equipment in taking the blood specimen, and more specifically, that he did not use a needle. We hold the vial used in collecting this sample was adequately established by the

record as uncontaminated by alcohol or other substances which might affect the test. No more should be required. See State v. Binkley, 201 N.W.2d 917 (Iowa 1972). The same vial distribution plan used here (from coroner to mortician) is apparently followed in California. See McGowan v. City of Los Angeles, 100 Cal.App.2d 386, 223 P.2d 862 (1950). Nor is it unique not to use an originally factory wrapped, disposable needle and syringe to withdraw test blood from a cadaver. See Woosley v. Central Uniform Rental, 463 S.W.2d 345 (Ky.1971); Young v. All American Assurance Company, 243 So.2d 894 (La.App.1971), cert. denied, 258 La. 349, 246 So.2d 197 (1971); Hoffman v. Tracy, supra. That requirement is found only in the implied consent law. Section 321B.4, The Code, 1966.

 The proffered, uncontroverted testimony of Dr. Preacher indicates the exact method used by Jenks in taking the sample satisfied medical standards and would not adversely affect the test. Such evidence was foundationally sufficient, on this point, to permit plaintiff to introduce the test results.

While defendant argues the scissors used to make the incision in this decedent were not shown to be sterile, the proof made and offered was that the vial did not come into contact with the body, and the blood, because of the gaseous pressures in the system, flowed freely when the incision was made. Under these circumstances, Dr. Preacher's proffered testimony is supported by reason and logic.

We hold, on this record, trial court erred in dismissing that portion of plaintiff's cause of action grounded on § 129.2, The Code, 1966. Trial court mistakenly applied the Lessenhop nine-point formula in a situation it did not control.

In this case it is obvious the jury present in the courtroom was waived only after the limine motion ruling effectively emasculated plaintiff's cause. The waiver expedited

submission of proof required to submit the law issues to this court. We therefore remand for jury trial unless both parties again agree to waive a jury.

Reversed and remanded.