Billy R. HENDRICKS and Carol Hendricks, Appellants,

v.

Edward D. BRODERICK, Appellee.

No. 61959.

Supreme Court of Iowa.

Oct. 17, 1979.

Lew Eells and Daniel Den Beste, of Eells, Blackstock, Affeldt & Harms, Cedar Rapids, for appellants.

Raymond R. Stefani, of Silliman, Gray & Stapleton, Cedar Rapids, for appellee.

Considered by REYNOLDSON, C. J., and LeGRAND, UHLENHOPP, McCORMICK, and LARSON, JJ.

UHLENHOPP, Justice.

Disposition of this appeal in a personal injury action turns on a jury instruction on contributory negligence.

Plaintiff Billy R. Hendricks, an insurance agent, has participated in hunting wild game since he was a teenager, and began hunting wild tom turkeys in 1974 after reading articles on that subject and attending a seminar. Defendant Edward D. Broderick, an older person engaged in construction and real estate development, educated himself on turkey hunting by obtaining instruction, reading periodicals, and visiting with experienced hunters.

A turkey hunter listens for the gobble of a tom and begins sending out the softer yelp of a hen by using a calling device. He endeavors to get responses from the tom and to entice the bird within gunshot. The tom turkey is normally distinguishable by a red beard.

Hendricks realized that a turkey hunter does not intrude on another hunter who is "working" a tom turkey, that is, seeking to draw the tom near by making the yelp sounds.

On May 1, 1976, Hendricks and Broderick, independently but each with a companion, went turkey hunting in Shimek Forest in southeast Iowa. Both were camouflaged. The forest is dense and has heavy underbrush, very tall trees, gullies, and ridges. Early that morning these men separately entered the forest, which was dark.

The jury could find that after Hendricks entered the forest he heard the gobble of a tom and worked the turkey by making yelp sounds. He "spooked" (frightened off) that bird, however, and proceeded on, listening for another one.

Meanwhile Broderick also heard a tom gobbling and proceeded to imitate the yelp sounds of a hen turkey. He testified regarding his understanding of turkey hunting and the specific events of that morning:

Q. Who is this that says this? A. The record, this record that we had and from the instructions I got from people that are experienced turkey hunters, that then when he finally leaves the roost he may not gobble at all anymore and he will close in on where he hears this yelping thinking it's a hen turkey, and some times it takes them 20 or 25 minutes to work up to where they think this hen turkey is, and maybe they'll even circle around in back of the hunter and so all you see is this dense underbrush, this is real thick forest. It's very dense and the underbrush is very heavy and massive and some times all you'll see of the turkey is a flash or movement, or if he sees you or anything, he's gone in a second and that's what you watch for.

Q. You don't watch for the beard? A. You watch for the turkey.

Q. For the beard? A. Sir?

Q. For the beard on the tom, you don't watch for that? A. You watch for the turkey, yes.

Q. How do you know it's not a female turkey if you're just watching for flashes? A. The reason I figured it wasn't a female turkey, a female turkey don't answer a call, another female call, and I was working this turkey and he was answering me all the time and I—

Q. How far was he from you? A. At the time I went in there was about—I thought he was about 200 yards away from me.

Q. You say you saw a movement in the brush? A. Yes.

Q. How was the lighting at this time? A. Very dim.

Q. Very dim. Where was the sun, where was the sun? A. The sun was just barely coming up.

Q. What time was it? A. Well, I was in there about—it was around five or 5:15 or 5:30 maybe, sometime in there.

Q. And how far was this movement from you? A. I saw the movement first, it was about—I saw the first time I saw the movement I would say it was about 30 yards from me and it disappeared, I didn't see it anymore, and then I thought that was the turkey and I waited. I just saw that flash, that movement, then it disappeared or stopped.

Q. Did you do anything at that time? A. I didn't do anything.

Q. How long had it been that you had been yelping before you saw the movement? A. I had been yelping 20 or 25 minutes.

Q. Constantly? A. On and off.

Q. Now, what do you mean by on and off, do you wait? A. You don't call constantly. You'll call and wait four or five minutes and then you'll call again.

Q. So you had been waiting maybe four or five minutes before you saw this movement? A. Well, I could have been waiting a longer period of time than that.

Q. Maybe ten minutes? A. Maybe even ten minutes.

Q. Did you hear anything at the time you saw the movement? A. No, I didn't.

Q. You only saw movement in the brush? A. Yeah.

Q. Now, did you take any action then when you saw that movement? A. The first time?

Q. Yes. A. No.

Q. What did you do? A. I didn't do anything because it disappeared and I didn't see it anymore.

Q. Did you continue to look for more? A. Yes, I did.

Q. And what did you see, if anything? A. Well, then shortly after that about 25 yards or 30 yards further I saw this movement again and I assumed by me calling this tom turkey and him answering me that—

Q. Just a moment. I don't want to know what you assumed yet. A. Okay.

Q. You say you saw movement later? A. Yes.

Q. Further away from you. Could you tell what that movement was at that time? A. It was my judgment that was the tom turkey.

Q. You say it was your judgment but could you tell what it was? A. I couldn't tell what it was. It was the same size as a turkey, as much of it I saw was dark and it looked the same size as a turkey, and I figured the turkey had seen me the first time and he was leaving and I shot.

Q. You shot at that movement? A. Yes, I did.

Q. And you said it was about how far from you at the time you shot? A. I'd say about 60 yards.

Q. And did you hit anything? A. Sir?

Q. Did you hit anything? A. Yes, I did.

Q. What? A. I hit Mr. Hendricks.

Broderick also testified:

Q. Is the wild turkey a wary bird? A. Very wary.

Q. And must the hunter make a swift decision if he's going to get a shot? A. Yes, he does.

Q. Mr. Broderick, on that day did you intend to shoot at Mr. Hendricks? A. No way.

Q. At any other person? A. No way.

Q. Did you intend to air or point your shotgun that day at Mr. Hendricks or any other person? A. No, sir.

Q. State whether or not you accidentally shot Hendricks on 1 May, 1976? A. Yes, I did.

Regarding his conversation with Hendricks after the incident, Broderick testified:

Q. Now, after you had shot at this movement in the brush, did you hear anything? A. I heard Mr. Hendricks yell.

Q. And did you then go to him? A. Well, the brush was pretty heavy and I had to walk where I was concealed out to the road and I walked down and I walked over to where Mr. Hendricks was.

Q. And what did you do then? A. Well, Mr. Hendricks was standing there with his gun in his hand and first thing he asked me, he said what size shot were you using. I told him I was using a No. 6 shot.

. . . .

Q. And when you reached him, what did he say? A. Well, the first thing he asked me was what size shot I used.

Q. And did he say anything further to you? A. Well, on our way out to the car I asked him if he had heard me calling that turkey.

Q. What was his answer? A. He said yes and he thought I was calling too loud.

Q. He said that he thought you were what? A. Calling the bird too loud with the caller.

Q. So he criticized your style and quality of yelping, is that it? A. Yes, sir.

The record contains considerable additional evidence but we need not recite it for purposes of this appeal.

Hendricks sued Broderick for compensatory damages in two counts: first for negligence, and second for gross negligence and recklessness. He also asked for exemplary damages. In the negligence count he alleged that "defendant was negligent in failing to identify his target before shooting at it with his shot gun." Hendricks' spouse joined him in the suit and asked damages in two corresponding counts for loss of consortium. The jury found for Broderick and Hendrickses appealed. We will speak of Billy R. Hendricks alone in this opinion, instead of both plaintiffs, as Hendrickses succeed or fail together in their appeal.

I. *Instruction 11.* The trial court submitted the case to the jury on the negligence count. Broderick pleaded contributory negligence as one of his defenses. The court submitted that defense to the jury in Instruction 11:

The law of Iowa provides that if a person who has been injured, was himself negligent, and such negligence was a proximate cause of his injury and resulting damages, then he cannot recover

from another. This is known as the defense of contributory negligence and the burden of proof of such defense is upon the Defendant.

To sustain this defense the burden is upon the Defendant to prove by a preponderance of the evidence both of the following propositions:

1. That the Plaintiff, Billy R. Hendricks, was negligent in that he placed himself in a position of assuming whatever risk there would be when he voluntarily went turkey hunting in Shimek Forest.

2. That such negligence was a proximate cause of his injury and damages, if any.

Proximate cause has been defined in another instruction.

A particular result may have more than one proximate cause, and the negligence of two or more persons may combine so that the negligence of each is a proximate cause of the injury. The negligence of the injured person must be a proximate cause of his injury but it need not be the only proximate cause.

If the Defendant has proved both of the foregoing propositions, then neither Plaintiff is entitled to recover and your verdict should be for the Defendant.

Hendricks objected in district court and objects here to the language, "was negligent in that he placed himself in a position of assuming whatever risk there would be when he voluntarily went turkey hunting in Shimek Forest."

■ Hendricks of course accepted the hazards which naturally attend turkey hunting in Shimek Forest *without culpability on the part of other hunters. Parsons v. National Dairy Cattle Congress,* 277 N.W.2d 620, 622 (Iowa 1979); *Rosenau v. City of Estherville,* 199 N.W.2d 125, 133 (Iowa 1972). In an ordinary negligence case like this, however, assumption of the risk of *negligence* on Broderick's part is not a separate defense. Under *Rosenau,* the defense is *contributory negligence* which, if supported by substantial evidence, should be submitted in the usual terms of the conduct of an ordinarily prudent person under the circumstances. Under the particular circumstances here the contributory negligence issue was whether, if Hendricks knew or in the exercise of due care should have known that Broderick was working a turkey at the place in question, Hendricks acted as an ordinarily prudent person in entering that place. If Broderick established by a preponderance of the evidence that Hendricks did not act as an ordinarily prudent person, and also that Hendricks' conduct constituted a proximate cause of the damages, Hendricks could not recover. Lively jury arguments could be made on both sides of this question.

■ The difficulty is that Instruction 11 does not proceed on this basis. Instead it permits the jury to find the defense established if Hendricks "placed himself in a position of assuming whatever risk there would be when he voluntarily went turkey hunting in Shimek Forest"—and that such conduct constituted a proximate cause. In the absence of evidence which does not appear here, however, a hunter does not assume *whatever* risk there would be by *voluntarily* hunting in Shimek Forest. This court stated in *Gross v. Miller,* 93 Iowa 72, 82, 61 N.W. 385, 388 (1884): "Men go hunting every day, and no one reasonably anticipates that, as a result, one will negligently shoot the other."

■ Although Shimek is a dark and deep forest, Hendricks had a right to assume, until he knew otherwise or in the exercise of ordinary care should have known otherwise, that other hunters would exercise due care under the circumstances, including the circumstance of the nature of the forest. *See Conrad v. Board of Supervisors,* 199 N.W.2d 139, 144 (Iowa 1972); *Jones v. O'Bryon,* 254 Iowa 31, 37, 116 N.W.2d 461, 465 (1962).

This instruction was on a vital point in the case and requires reversal.

II. Since the case will likely be retried, we will touch upon other issues Hendricks presents which will probably arise in another trial.

At trial Hendricks moved for a directed verdict in his favor on liability, leaving only the damage issue to be submitted to the jury. The trial court overruled the motion, and correctly so.

Hendricks had the burden of proof on negligence, and seldom does a party having the burden of proof on an issue establish it as a matter of law. This is especially true of common-law negligence, where the jury must not only find the objective facts as to conduct but must also decide whether that conduct amounts to want of ordinary care. *Johnson v. Svoboda,* 260 N.W.2d 530, 535–36 (Iowa 1977); *Davis v. Gatewood,* 228 N.W.2d 84, 85 (Iowa 1975). Moreover, Broderick generated a jury issue on contributory negligence. "Generally questions of negligence, contributory negligence and proximate cause are for the jury; it is only in exceptional cases that they may be decided as matters of law." Iowa R.App.P. 14(f)(10). Under the record here, negligence, proximate cause, and contributory negligence—in addition to damages—were issues for the jury to decide. *See* Annot. 26 A.L.R.2d 561, 567, 576, 592–95 (1969). Hendricks' cited decisions are distinguishable.

Hendricks also claims that the trial court should have submitted his second count to the jury, which was predicated on gross negligence and recklessness. If we recognized a tort cause of action which founded liability on *gross negligence,* the trial court would nonetheless have been correct in refusing to submit such a claim to the jury. While Hendricks adduced proof of negligence, the record does not contain substantial evidence of "gross" negligence—assuming that to be something more than negligence. But the court was also correct for the reason that we do not recognize degrees of negligence for liability purposes. "There are no degrees of care or of negligence in Iowa. *Tisserat v. Peters,* 251 Iowa 250, 252, 99 N.W.2d 924, 925, 926, and citations. The standard is always the care which an ordinarily prudent person would use under the circumstances." *Werthman v. Catholic Order of Foresters,* 257 Iowa 483, 492, 133 N.W.2d 104, 109 (1965).

> This court has said that *recklessness* is more than negligence, more than the want of ordinary care. It means proceeding with no care coupled with disregard for consequences. The acts must manifest a heedless disregard for or indifference to the rights of others in the face of apparent danger or be so obvious the operator should be cognizant of it, especially when the consequences of such actions are such that an injury is a probability rather than a possibility. Recklessness may include willfulness or wantonness, but if the conduct is more than negligence it may be reckless without being willful and wanton.

*Vipond v. Jergensen,* 260 Iowa 646, 650, 148 N.W.2d 598, 600–01 (1967). *See also Seisseger v. Puth,* 213 Iowa 164, 182, 239 N.W. 46, 54 (1931). While the record adequately supports Hendricks' allegation of negligence, it does not contain substantial evidence of the kind of conduct described in *Vipond* as recklessness.

Thus the trial court did not err in refusing to submit Hendricks' second count. By the same token, Hendricks did not introduce substantial evidence which would support an award of exemplary damages. *See White v. Citizens National Bank of Boone,* 262 N.W.2d 812, 817 (Iowa 1978). We have here an ordinary common-law negligence action for compensatory damages. *See* 22 Am.Jur.2d *Damages* § 251, at 343 (1965); 25 C.J.S. *Damages* § 123(8), at 1147 (1966).

Since the trial court correctly refused to submit Hendricks' liability claim founded on gross negligence and recklessness for want of substantial evidence, it also properly refused to instruct that contributory negligence is not a defense to such a claim.

We return the case to district court for retrial.

REVERSED.