Ronald SECHLER, Administrator of the
Estate of Jeffrey Sechler,
Deceased, Appellant,

v.

STATE of Iowa, Roger Bierbaum and
Lowell Essick, Appellees.

STATE of Iowa, Appellee,

v.

GRAVES CONSTRUCTION CO., INC. of
Melvin, Iowa, and Midwest Paving Co.,
of Sioux City, Iowa, Appellees.

No. 68678.

Supreme Court of Iowa.

Nov. 23, 1983.

Rehearing Denied Dec. 21, 1983.

John D. Loughlin and Donavon D. Schaefer of Loughlin Law Firm, Cherokee, for appellant.

Thomas J. Miller, Atty. Gen., and Richard E. Mull, Asst. Atty. Gen., for appellees.

SCHULTZ, Justice.

This appeal requires us to determine whether the term "gross negligence" as used in Iowa Code section 306.41 is a higher degree of negligence that is subject to the defense of contributory negligence or a different kind of conduct that is immune to such defense. Section 306.41 places liability upon the agency having jurisdiction over temporarily closed roads and the person or contractors employed to carry out the construction only in the event that damage to vehicles or persons using the road is caused "by gross negligence."

The plaintiff, Ronald Sechler, administrator of the estate of Jeffrey Sechler, deceased, filed a tort action against the State and two of its employees based on alleged negligence in barricading a closed highway. The State's cross-petition against the construction companies involved in rebuilding the closed highway was severed from this action.

The case was tried to the court, and the action against the two employees was dismissed. The trial court found the State grossly negligent; however, the plaintiff was denied recovery because of the contributory negligence of the decedent.

This tragic accident occurred in the early morning hours of August 2, 1979, when a motorcycle driven by the decedent struck a barricade across an officially closed section of Highway 3, near Cherokee, Iowa. Decedent was returning to his home after spending an evening drinking with friends at several taverns in Cherokee. He entered Highway 3 and traveled in a northwesterly direction past the posted "ROAD CLOSED" sign. He passed two staggered barriers that extended across each lane of the two-lane highway. He had to zigzag through the barriers before approaching the one he hit. The barrier he struck was topped with two long 2 × 8 boards and backed by two very large chunks of concrete. The barrier evidently had been reinforced in this manner because it had been knocked down by vandals on several occasions. The decedent was thrown from the motorcycle and killed instantly.

On appeal plaintiff asserts that: (1) under section 306.41 when gross negligence is established, the defense of contributory negligence is unavailable; (2) the State failed to establish an adequate foundation for the admission of a blood alcohol test performed on a sample taken from decedent's body, a test which showed a blood alcohol level of .21 percent alcohol by weight; and (3) there was not substantial evidence that plaintiff's decedent was contributorily negligent.

Before we address these contentions, we will consider an alternative argument advanced by plaintiff. Specifically, plaintiff contends that, in the absence of a disposition favorable to the plaintiff on the issue of contributory negligence, the doctrine of comparative negligence should be applied. Thus, if we decide consideration of the decedent's negligence is appropriate, this should not operate to completely bar recovery but merely to reduce the amount of damages plaintiff would otherwise be entitled to collect. Because plaintiff failed to preserve error on this issue, the precepts of

comparative fault do not govern the outcome of this case.

We recently held in *Goetzman v. Wichern,* 327 N.W.2d 742, 745 (Iowa 1982) "that in all cases in which contributory negligence has previously been a complete defense, it is supplanted by the doctrine of comparative negligence." *Id.* In regard to retroactivity we indicated that our adoption of comparative negligence was applicable to "all pending cases, including appeals, in which the issue has been preserved." *Id.*

■ Plaintiff claims he preserved error by his motion to amend conclusions of law concerning the trial court's ruling that decedent's contributory negligence barred recovery. In that motion and also in a subsequent motion for a new trial, plaintiff repeatedly stated that contributory negligence is an improper defense to actions based on gross negligence. These references to the impropriety of contributory negligence as a defense fall short of preserving error on the issue of comparative negligence. In particular, the attack by the plaintiff on the defense of contributory negligence did not sufficiently alert the trial court that rather than considering the decedent's negligence as a complete bar to recovery, it should substitute the standard of comparative fault. *See Schuller v. Hy-Vee Food Stores, Inc.,* 328 N.W.2d 328, 333 (Iowa 1982). Having decided the plaintiff failed to preserve error on the doctrine of comparative negligence, we now turn to the issue of whether contributory negligence is available as a defense in actions based on gross negligence.

## I. Gross Negligence

Until *Goetzman,* we long embraced the common law doctrine that contributory negligence is a complete bar to recovery in actions based on negligence. Conversely, this defense was not available when liability was based on more culpable conduct such as recklessness, willfulness or wantonness. *Siesseger v. Puth,* 213 Iowa 164, 182, 239 N.W. 46, 54 (1931); *Restatement (Second) of Torts* §§ 482, 503 (1965); 57 Am.Jur.2d *Negligence* § 307 (1971); 65A C.J.S. *Negli-*

*gence* § 131(a) (1966); *Cf. Restatement (Second) of Torts* § 503 (while contributory negligence does not bar recovery caused by defendant's recklessness, plaintiff's contributory recklessness or assumption of risk is a bar).

We pointed out in *Goetzman* that the legislature had abrogated the doctrine of contributory negligence in certain limited situations involving suits by employees and further had shifted the burden of proof on this issue to the defendant. 327 N.W.2d at 747–48. Despite these minor legislative changes, the doctrine of contributory negligence remained part of our common law until we judicially adopted comparative negligence in *Goetzman.* As indicated earlier, this substitute doctrine is not available to the plaintiff. Thus, this case is governed by our common law principles of contributory negligence. The applicability of this defense to an action under section 306.41 depends, in turn, on what the legislature intended when it used the term "gross negligence." Initially we must determine whether the legislature intended the term "gross negligence" to mean a greater degree or a different kind of negligence.

Plaintiff claims that the legislature intended to establish a new kind of negligence by its enactment of section 306.41. He correctly points out that our prior decisions uniformly hold there are no degrees of negligence in Iowa. *See e.g., Hendricks v. Broderick,* 284 N.W.2d 209, 214 (Iowa 1979) ("we do not recognize degrees of negligence for liability purposes"); *Denney v. Chicago, Rock Island, Pacific Railroad Company,* 150 Iowa 460, 464–65, 130 N.W. 363, 364 (1911) ("the actionable character of negligence is not dependent upon its 'degree,' and the ancient differentiation into 'gross,' 'ordinary' and 'slight' has come to mean little more than a matter of comparative emphasis in the discussion of the testimony"); *see also Tisserat v. Peters,* 251 Iowa 250, 252, 99 N.W.2d 924, 925–26 (1959). Thus, plaintiff reasons that the legislature's use of the term "gross negligence" evinces an intention to establish a new type of negligence—one not vulnerable to the defense of con-

tributory negligence. Essentially, plaintiff claims that the legislature was acquainted with our nonrecognition of degrees of negligence and consequently intended its use of "gross negligence" to be something other than a mere degree of negligent conduct.

The trial court did not agree with plaintiff's assessment and ruled that gross negligence, as used in this section, is a higher degree of negligence rather than a different kind. Specifically, the trial court distinguished gross negligence from wanton or reckless misconduct and concluded that gross negligence, while greater in magnitude than ordinary negligence, is something less than willful, wanton or reckless conduct. Given this definition, the trial court ruled an action based on gross negligence was subject to the defense of contributory negligence.

We agree with the trial court's conclusion that gross negligence, as the term is used here, is only a greater degree of negligence, and that an action based on gross negligence is subject to the defense of contributory negligence. In reaching this conclusion, we are mindful of our prior caselaw refusing to recognize degrees of negligence. Nevertheless, that law is not controlling here. The issue presented in this case is the definition of gross negligence in a statutory enactment. Even though our prior cases have eliminated gross negligence from the common law, it was within the legislature's prerogative to reinstate it as a basis for liability. Thus, our conclusion is based upon our interpretation of the statutory meaning of the term.

■ In our role of determining the meaning of statutes, the ultimate goal is to ascertain and if possible give effect to the intention of the legislature. *Janson v. Fulton,* 162 N.W.2d 438, 442 (Iowa 1968). When a statute does not define or explain a term, we generally resort to the common law to give it meaning. *Hassebroch v. Weaver Construction Co.,* 246 Iowa 622, 627, 67 N.W.2d 549, 552 (1955). Degrees of negligence were recognized in early common law. These degrees were described by the terms slight, ordinary and gross. 65 C.J.S.

*Negligence* § 8(1) (1966). Thus, our interpretation of gross negligence as a degree of negligence rather than a different kind is consistent with the common law.

It is also consistent with our recent pronouncement in *Thompson v. Bohlken,* 312 N.W.2d 501 (Iowa 1981), where we interpreted a somewhat similar statute. There, we were confronted with the need to interpret Iowa Code section 85.20 which provided that workers' compensation is the exclusive remedy for an injury action against a co-employee, except when such injury is caused by the other employee's "gross negligence amounting to such lack of care as to amount to wanton neglect for the safety of another." *Id.,* Iowa Code (1983). In our discussion of this section we stated:

> The term "gross negligence" is said to be nebulous, without a generally-accepted meaning: it implies conduct which, while more culpable than ordinary inadvertence or unattention, differs from ordinary negligence only in degree, not kind. W. Prosser, *Handbook of the Law of Torts* § 34, at 183–84 (4th ed. 1971). However, the legislature added a new dimension and a certain amount of refinement to the term "gross negligence" in section 85.20 by providing it must "amount to wanton neglect for the safety of another."

*Id.* at 504. *See also Frederick v. Western Union Telegraph Co.,* 189 Iowa 1338, 1340, 179 N.W. 934, 935 (1920) ("It is true that gross negligence is not a distinct cause of action but a *degree of negligence* and negligence without reference to degree is the basis for the right to recover.") (emphasis added).

■ Although our statements in *Thompson* were not necessarily involved in nor essential to the determination of the issues there, we recognized that gross negligence is ordinarily only a degree of negligence. We see no reason to refute that language in this case where the legislature did not provide a refinement to the term "gross negligence" by the addition of the term wanton neglect. Accordingly, we hold that gross negligence under section 306.41 is a higher

degree of negligence rather than a different kind.

In so holding, we approve of the trial court's adoption of Professor Prosser's statements that gross negligence "signifies more than ordinary inadvertance or inattention, but less than conscious indifference to consequences; and that it is, in other words, merely an extreme departure from the ordinary standard of care." Prosser, *Handbook of the Law of Torts* § 34 at 184 (4th ed. 1971). This definition limits gross negligence to something less than conscious indifference to the consequences, that is, to something less than recklessness or wantonness. We defined recklessness in *Vipond v. Jergensen*, 260 Iowa 646, 148 N.W.2d 598 (1967). There this court said that recklessness

> [m]eans more than negligence, more than the want of ordinary care. It means proceeding with no care coupled with disregard for consequences. The acts must manifest a heedless disregard for or indifference to the rights of others in the face of apparent danger or be so obvious the operator should be cognizant of it, especially when the consequences of such actions are such that an injury is a probability rather than a possibility. Recklessness may include willfulness or wantonness, but if the conduct is more than negligence, it may be reckless without being willful and wanton.

*Id.* at 650, 148 N.W.2d at 600–01. Thus gross negligence is something less than conscious indifference while recklessness is a heedless disregard for or indifference to others. Without defining the misconduct of wantonness, it means something more than recklessness. *Sanburn v. Rollins Hosiery Mills*, 217 Iowa 218, 224, 251 N.W. 144, 147 (1933).

■ In conformity with our determination that gross negligence, as the term is used in this statute, is a higher degree of negligence, we also hold that a successful contributory negligence defense, when applicable in a particular case, is a bar to this action. Where gross negligence is considered a degree of negligence rather than a different kind, contributory negligence is a defense that bars recovery. 57 Am.Jur.2d *Negligence* § 307 (1971); 65A C.J.S. *Negligence* § 131(b) (1966).

## II. Admissibility of Blood Test

Plaintiff claims the trial court erred in admitting testimony concerning the decedent's blood alcohol level because the State failed to establish an adequate foundation for its admission. Specifically, plaintiff complains the State failed to prove that (1) the mortician who drew the blood sample was designated to do so by a physician; (2) the procedures used by the mortician in withdrawing the blood sample complied with the medical customs, practices and procedures in use at the time and place the withdrawal was performed; (3) the equipment used to draw and store the blood was sterile or free from contamination; and (4) the labeling and storage of the sample prior to the test was proper, and the sample was adequately protected from tampering and contamination.

■ The standard for laying a proper foundation for the admission of a blood test in a civil damage action was set forth in *Lessenhop v. Norton*, 261 Iowa 44, 51, 153 N.W.2d 107, 111 (1967) and reaffirmed in *Henkel v. Heri*, 274 N.W.2d 317, 322 (Iowa 1979). This foundation "must show that the specimen was taken by a duly authorized person using proper sterile equipment, that it was properly labeled and preserved, and that its care and transportation were proper." *Lessenhop*, 261 Iowa at 51, 153 N.W.2d at 111. It also must establish the identity of persons processing it so the opposing party has an opportunity to inquire into the care and procedure used in the test. *Id.* Whether the moving party has established a chain of custody and a proper foundation is a matter committed to the sound discretion of the trial court; reversal is warranted only when there is a clear abuse of discretion. *State v. Gibb*, 303 N.W.2d 673, 681 (Iowa 1981).

■ The required proof to show that the mortician was an authorized person and

used proper procedures was made by the State. Although Iowa Code chapter 321B requires a designation of the person by a physician, *Lessenhop* does not make this requirement in civil actions for damages. All that is required is that the person be authorized. We found in *Brooks v. Engel,* 207 N.W.2d 110 (Iowa 1973) that a blood test taken by a trained mortician met this requirement. *Id.* at 116. The testimony here showed the mortician had training and experience similar to the mortician in *Brooks.* He had taken blood samples previously under the direction of the medical examiner. He followed the same procedures on this occasion while the medical examiner was in the near vicinity.

█ The issue concerning sterile equipment arose when the mortician admitted under cross-examination that he had no way of knowing whether the equipment he used was sterile. He obtained a disposable syringe and needle, still in its original factory wrapper, from the local hospital. The vial, a vacuum tube capped with a rubber stopper, came directly from a standard blood collection kit furnished by the Cherokee police department. Because vacuum tubes will not work on a dead body, the syringe was used to withdraw the sample. The mortician made a small incision in the carotid artery or jugular vein area in the lower portion of the neck. The blood vessel was lifted to the surface, and the syringe was inserted to remove the blood. The blood was then transferred to the vacuum tube by inserting the needle of the syringe through the rubber stopper. This allowed the vacuum to draw the blood into the tube. He then labeled the tubes and gave them to the officer. On cross-examination the mortician was asked whether he could tell positively that the rubber stopper on the tube and the syringe were sterile. He answered in the negative. Specifically, he stated that, although he could not tell whether the equipment was sterile or unsterile, the cap and tube were identical to the equipment he had always used for this procedure and, further, there was nothing to indicate that the syringe was unsterile.

The purpose of the required procedures is to protect the health of the person submitting to the test and to guarantee the accuracy of the test in judicial proceedings. We held in *State v. Binkley,* 201 N.W.2d 917 (Iowa 1972) that it was necessary to show the needles were sterile to protect the health; however, the State was not required to show the vial was sanitary and sterile. *Id.* at 920. It is only necessary to show the container was not contaminated by alcohol or other substances which might affect the validity of the test. *Id.* The inability of the mortician to positively state that the syringe and the bottle cap were sterile is not fatal to the foundation here. The evidence is clear that the factory wrapped syringe and needle were intact when received. Moreover, a capped vacuum tube from a regular alcohol collection kit was used. The mortician testified this tube was closed by a rubber stopper and was not subject to leakage except when the needle was withdrawn. The evidence indicates the mortician used substantial care and satisfies us the likelihood of contamination was remote.

█ Finally, plaintiff claims the labeling and storage of the sample did not meet foundational standards. Specific complaints are registered because the mortician did not seal the vial and the vial remained in an unlocked cooler for more than a week. During this time, 21 laboratory employees had access to the cooler. Thus, he claims the sample was subject to alteration or substitution.

█ The trial judge makes the determination as to the sufficiency of the foundation for the admission of evidence. In items that are susceptible to alteration by tampering or contamination, the court must consider the nature of the article, the circumstances surrounding its custody and the likelihood of intermeddlers tampering with it. *State v. Lunsford,* 204 N.W.2d 613, 617 (Iowa 1973). The State does not have to negate absolutely the possibility of tampering or substitution; it only needs to show that it is reasonably probable it did not occur. *Id.*

We determine that the trial court did not abuse its discretion in this regard. The mortician properly labeled the samples and presented the kit to the patrolman unsealed. The kit was then sealed and mailed to the laboratory. It was received in good shape with no evidence of tampering or spillage of blood. The samples were placed in a cooler that was only accessible to the employees of the laboratory. Sample tubes are sometimes but not always sealed when they are received in the laboratory. Here, the sample tube was capped with a rubber stopper. When a blood test is performed in the criminalistics laboratory we not only presume regularity but also do not presume an employee will contaminate or tamper with a sample. *State v. Lamp*, 322 N.W.2d 48, 59 (Iowa 1982). Under these facts we find little likelihood of tampering or contamination. Thus, we conclude the trial court did not abuse its discretion in overruling plaintiff's objections to the admission of the blood test.

### III. Sufficiency of the Evidence Concerning Contributory Negligence

Plaintiff contends the trial court erred in finding that decedent was contributorily negligent at the time of his fatal accident. He generally claims this finding was not supported by the record, and the State did not meet its burden of proof on the issue of contributory negligence as required by section 619.17 of the Iowa Code.

In its finding of fact the trial court generally stated that the decedent was contributorily negligent at the time of the accident causing his death. The court made no specific findings of contributory negligence; however, it did find that decedent was intoxicated and that his intoxication contributed to the accident. The court also discussed evidence that led to its conclusion that decedent did not attempt to avoid the barricade which should have been visible to him some 250–300 feet before he hit it.

Plaintiff claims the fact that decedent had been drinking or even that he was intoxicated does not constitute contributory negligence. We do not disagree with this limited statement. Our previous decisions clearly point out that the act of driving while intoxicated in violation of Iowa Code section 321.281 is not negligent per se and thus not conclusive evidence of contributory negligence so as to bar recovery. *Yost v. Miner*, 163 N.W.2d 557, 561 (Iowa 1968); *Chandler v. Harger*, 253 Iowa 565, 571–72, 113 N.W.2d 250, 253 (1954); *Nicholson v. City of Des Moines*, 246 Iowa 318, 324, 67 N.W.2d 533, 537 (1954). A drunken driver may be found negligent and barred from recovery if his intoxicated condition is translated into outward conduct which is negligent and bears a causal relation to his injury. *Yost*, 163 N.W.2d at 561. The matter of intoxication and its causal relationship to the injury are questions that must be decided by the factfinder. *Id.*

Although the trial court found intoxication and causation, it did not label the intoxication as per se negligent conduct. Instead it carefully quoted from *Yost* (quoting *Nicholson*) that intoxication is not conclusive evidence of contributory negligence, but it is admissible as a circumstance showing a lack of due care. We conclude that the trial court did not misapply the law in this instance.

Plaintiff also claims the trial court misplaced the burden of proof on the issue of contributory negligence. Although the court did not specifically refer to the respective burdens of proof on the parties in its finding of fact, in paragraph 8 it stated "the court now concludes that the defense of contributory negligence is available to the defendant." From this statement we conclude that the trial court treated contributory negligence as a defense available to the defendant rather than a matter the plaintiff must disprove.

Likewise, the court's reference to the absence of skid marks does not indicate it shifted the burden of proof on contributory negligence to the plaintiff. While there was no direct testimony about skid marks, plaintiff placed into evidence numerous photographs taken at the scene shortly after the accident, an officer's report, and a

detailed diagram of the accident scene. Testimony indicated that the motorcycle headlight was on high beam, visibility was clear and the roadway was dry. It further showed that prior to reaching the barricade in question, a westbound motorist would have to zigzag through two staggered partial barricades. On the night of the accident, the fatal barricade was visible from a distance of 250–300 feet away. There was room on either side of the barricade to drive around it. This had been the usual practice of other motorists. The evidence also indicates decedent's motorcycle hit and crashed through the barricade near the middle of the north half of the highway causing a concrete piece weighing about 4000 pounds to be pushed back 10 feet by the impact. The motorcycle was demolished and decedent was thrown 100 feet beyond the barricade. Plaintiff's own evidence indicated that if decedent had seen the barricade at 217 feet away he would have had 3.75 seconds of time for evasive action if his speed was 40 miles per hour, 2.9 seconds at 50 miles per hour and 2.46 seconds at 60 miles per hour. The trial court considering all these exhibits and the circumstances of the accident had substantial evidence to conclude there were no skid marks and decedent did not take evasive action to avoid the barricade. We do not agree that the trial court shifted the burden of proof of contributory negligence to the plaintiff.

Neither do we agree with the contention that there is not substantial support in the record for the trial court's findings. Findings of fact by the trial court in an action at law are binding upon the appellate court if supported by substantial evidence. Iowa R.App.P. 14(f)(1). There is ample evidence to support the trial court's finding that the decedent failed to exercise ordinary care and, further, that this failure contributed to both the accident and his subsequent death.

We have considered all of the arguments of the parties, even though we have not addressed each one specifically. We hold that the trial court did not commit reversible error.

AFFIRMED.

All Justices concur except UHLENHOPP, CARTER, McGIVERIN and WOLLE, JJ., who dissent.

UHLENHOPP, Justice (dissenting).

I. Absent any statutes on the subject, we could place degrees of culpability, in less than the intentional and strict liability torts, into neat categories such as negligence and recklessness. Then, placing the problem of comparative negligence aside, we could hold that a plaintiff's contributory negligence bars recovery for the defendant's negligence, and a plaintiff's recklessness bars recovery for the defendant's recklessness—in accordance with the view of the American Law Institute. *Restatement (Second) of Torts* § 467 (contributory negligence), § 482 (recklessness).

The difficulty is that we do have statutes on the subject. The General Assembly has employed at least four expressions in this area. It used the term "reckless" for a number of years, in our guest statute. Iowa Code § 321.494 (1983) (statute held unconstitutional in *Bierkamp v. Rogers,* 293 N.W.2d 577 (Iowa 1980)). That term received a quite definite meaning at the hand of this court. *Vipond v. Jergensen,* 260 Iowa 646, 650, 148 N.W.2d 598, 600 (1967) ("no care coupled with disregard for consequences"). Next in line as to culpability, the General Assembly has employed the expression "gross negligence amounting to such lack of care as to amount to wanton neglect", in our worker's compensation law. Iowa Code § 85.20(2). We defined that expression in *Thompson v. Bohlken,* 312 N.W.2d 501, 505 (Iowa 1981) ("1. knowledge of the peril to be apprehended; (2) knowledge that injury is a probable, as opposed to a possible, result of the danger; and (3) a conscious failure to avoid the peril"). Going down another step, we have legislative use of the term that we are trying to define here, "gross negligence." Iowa Code § 306.41. At the lowest level we have legislative employment of the word

"negligence" in such statutes as section 619.17 of the Code. This court has stated that "negligence" is failure to exercise "reasonable care." *Appling v. Stuck,* 164 N.W.2d 810, 814 (Iowa 1969).

Our duty in applying present section 306.41 is to ascertain the Assembly's intent in using the expression "gross negligence" with reference to a defendant's conduct. The conclusion seems reasonable that it did not mean "reckless," or "gross negligence" amounting to "wanton neglect," or "negligence". Had it intended any of those culpabilities it could have employed the expressions it used previously. Apparently it meant conduct less culpable than "reckless" or "gross negligence" amounting to "wanton neglect", but more culpable than "negligence".

II. What then about a plaintiff's own conduct, on the other side of the equation? Assuming that legal cause is proved, if a defendant is not liable unless he is "grossly negligent" can he defeat a plaintiff by showing the plaintiff was merely "negligent"? The defendant's "gross negligence" might be gross indeed while the plaintiff's "negligence" might be only slight. Where a plaintiff is required to show and does show that the defendant is guilty of gross negligence, I think the plaintiff should only be defeated by his own culpability if it rises to the level of gross contributory negligence. *Stinson v. Daniel,* 220 Tenn. 70, 78, 414 S.W.2d 7, 10 (1967) ("Ordinary contributory negligence will not bar a recovery in an action based on gross or wanton negligence, unless the contributory negligence is also gross or wanton."); *Hood v. Waldrum,* 58 Tenn.App. 512, 521, 434 S.W.2d 94, 98 (1968) ("If plaintiff's negligence was also gross, defendant is not liable even for gross negligence."); *Brown v. Barber,* 26 Tenn. App. 534, 541, 174 S.W.2d 298, 300 (1943) ("while mere ordinary contributory negligence will not operate to bar a recovery in an action founded on gross negligence, yet where the contributory negligence also is gross instead of ordinary, there is no liability").

The trial court found that the State was grossly negligent and that the gross negligence was a legal cause of the incident. The evidence presents a question of fact as to whether the deceased driver was also grossly negligent and, if so, whether his gross negligence also was a legal cause of the incident. I would reverse and remand for a factfinding on the latter two issues and for judgment accordingly, upon the trial record already made.

CARTER, Justice (dissenting).

I respectfully dissent from the court's interpretation of Iowa Code section 306.41 (1981) and from the result.

The court's interpretation of the words "gross negligence" as used in that statute unnecessarily resurrects an unworkable, thoroughly discredited, and long-abandoned system of classifying tortious conduct according to degree rather than kind. As stated in *Denney v. Chicago, Rock Island, Pacific Ry. Co.,* 150 Iowa 460, 464–65, 130 N.W. 363, 364–65 (1911):

> In this state, as is well known, the actionable character of negligence is not dependent upon its "degree," and the ancient differentiation into "gross," "ordinary," and "slight" has come to mean little more than a matter of comparative emphasis in the discussion of testimony.

While it clearly would lie within the power of the legislature to resurrect that means of classifying conduct for purposes of imposing legal liability, there is no reason to attribute such intent to the legislation now before us. To the extent the majority seeks to interpret the statute in accordance with the teachings of the common law, I submit that the court should seek guidance from the contemporaneous common law.

I believe the preferable place to start in interpreting the language of this statute is the consideration of its direct application. The majority instead has focused primarily on the collateral consequences which flow from the meaning ascribed to the words "gross negligence," *i.e.,* how our interpretation will affect the contributory negligence defense. In direct application, it seems

clear that the legislature was concerned with limiting the liability of the state agency and its contractors with respect to persons injured on temporarily closed highways. It is equally clear that it intended to limit recovery on claims of this type to those situations where it can be established that the conduct of the state agency or its contractors constitutes a greater departure from the legal norm than need be shown to establish negligence.

The issue of interpretation thus becomes where was the line of demarcation intended to fall. This involves both the resolution of the abstract issue and the articulation of the answer in understandable terms which may be applied by courts and juries in deciding actual cases.

The majority ascribes to the legislature the intent to add an additional rung to the already overburdened ladder of ascending levels of tortious conduct. Above negligent acts on the existing ladder already lie reckless, wanton, and willful acts. *See, e.g., Mescher v. Brogan,* 223 Iowa 573, 579–80, 272 N.W. 645, 649 (1937). The majority places the new level of conduct to which it assigns "gross negligence" immediately above negligence in ascending order. For purposes of determining the line of demarcation between acts of simple negligence and the new level of "gross negligence," the majority focuses on the extent of departure from reasonable care rather than involving those elements of disregard for consequences usually associated with reckless or wanton conduct.

I submit that the majority has unnecessarily complicated our tort law and left us without any meaningful definition of "gross negligence" for purposes of applying section 306.41. I also believe that it errs in ascribing to the legislature the intent to squeeze a new level of tortious conduct between negligent acts and reckless acts. The words "gross negligence" suggest a major departure from reasonable conduct. In instances where such a departure is established, the elements of proceeding without heed or concern for the consequences will ordinarily arise by implication, thereby equating gross

negligence with recklessness in fact if not in law. Viewed in this light, I find the distinction drawn by the majority to be largely imaginary. The distinction is made to appear real only by employing the technique of defining the same thing in different terms.

We have quite recently concluded that the term "gross negligence," without additional dimension is nebulous. *Thompson v. Bohlken,* 312 N.W.2d 501, 504 (1981). In discussing how some courts have dealt with this problem, Prosser, *Handbook of the Law of Torts* section 34 at 183 (4th ed. 1971) states:

> Several courts, however, dissatisfied with a term so nebulous and struggling to assign some more or less definite point of reference to it, have construed gross negligence as requiring wilful misconduct or recklessness, or such utter lack of all care as will be evidence of either—sometimes on the ground that this must necessarily have been the intent of the legislature.

Our own legislature has adopted this meaning of "gross negligence" in enacting Iowa Code section 85.20. I see no reason for ascribing a different meaning to the same term in construing section 306.41, simply because the legislature added more dimension to the term in one statute than it did in the other. Construing the term to mean the same thing in both statutes would avoid confusion and, in addition, would avoid the creation of an additional level of tortious conduct, poorly defined, which will almost certainly overlap with acts of reckless conduct under existing law.

I would hold (1) that "gross negligence" as used in section 306.41 should be equated with conduct amounting to wanton neglect for the safety of another; (2) that by reason of the principles followed in *Siesseger v. Puth,* 213 Iowa 164, 182, 239 N.W. 46, 52 (1931) and *Restatement (Second) of Torts* section 503 (1965) contributory negligence is not a defense to claims under section 306.-41; and (3) that because the trial court used an incorrect standard for determining "gross negligence" under section 306.41, its judgment must be reversed. I would re-

mand the case for a supplemental opinion and judgment by the trial court on the existing record based on the definition of "gross negligence" which I have suggested for applying section 306.41.

McGIVERIN and WOLLE, JJ., join this dissent.