# IN THE SUPREME COURT OF IOWA

No. 14–1649

Filed March 18, 2016

Amended June 28, 2016

**PEG HUTCHISON, DAN JOHNSON, RUSS NICHOLS, SHAWN RIPPERGER, LEIGH ANN SWAIN,** and **SHELLY VANDER TUIG,**

Appellants,

vs.

**DOUGLAS SHULL, STEVE WILSON, DEAN YORDI, THE BOARD OF SUPERVISORS FOR WARREN COUNTY, IOWA,** and **WARREN COUNTY, IOWA,**

Appellees.

Appeal from the Iowa District Court for Warren County, Mary Pat Gunderson, Judge.

Former county employees appeal a district court judgment finding no violation of the open meetings law found in Iowa Code chapter 21. **REVERSED AND REMANDED WITH DIRECTIONS.**

Thomas W. Foley, David H. Goldman and Katie Ervin Carlson of Babich Goldman, P.C., Des Moines, and Michael J. Carroll of Coppola, McConville, Coppola, Carroll, Hockenberg & Scalise, P.C., West Des Moines, for appellants.

Patrick D. Smith and Mitchell G. Nass of Bradshaw, Fowler, Proctor & Fairgrave, Des Moines, for appellees.

Ryan G. Koopmans and Scott A. Sundstrom of Nyemaster Goode, P.C., Des Moines, for amici curiae Iowa Newspaper Association and Iowa Freedom of Information Council.

**WIGGINS, Justice.**

Former Warren County employees brought an action against the county and its board of supervisors alleging a violation of the open meetings law contained in chapter 21 of the Iowa Code. The district court dismissed the action, finding the board members' activities did not constitute a "meeting" as defined in Iowa Code section 21.2(2) (2013). In reaching its conclusion, the district court found that although the board members deliberated concerning matters within the scope of their policy-making duties, a majority of the supervisors never deliberated at a meeting within the meaning of section 21.2(2). On appeal, we conclude the definition of meeting in section 21.2(2) extends to all in-person gatherings at which there is deliberation upon any matter within the scope of the policy-making duties of a governmental body by a majority of its members, including in-person gatherings attended by a majority of the members by virtue of an agent or a proxy. Therefore, we reverse the judgment of the district court and remand the case for further proceedings consistent with this opinion.

## I. Background Facts and Proceedings.

As permitted under the Iowa Code, a board of supervisors consisting of three elected board members governs Warren County (the county). *See* Iowa Code § 331.201. At all times relevant to this appeal, the Warren County Board of Supervisors was comprised of board members Douglas Shull, Steve Wilson, and Dean Yordi. Prior to the events giving rise to this suit, the county employed approximately 175 full-time employees in thirty-five departments.

The citizens of Warren County first elected Supervisor Shull to the board of supervisors in 2008. During his campaign, Shull promised to increase the overall efficiency of the county government. After

Supervisors Yordi and Wilson joined the board in 2010, they elected Supervisor Shull to the position of board chair. Like Supervisor Shull, Supervisor Yordi campaigned on improving government efficiency when he ran for office.

In May 2013, the supervisors hired Mary Jean Furler for the newly created position of Warren County Administrator to assist them in achieving their objective of improving the efficiency of the county government. As county administrator, Furler implemented board actions, supervised appointed department heads, and directed preparation of the annual budget, among other duties. In addition, she was responsible for assisting the board with developing and prioritizing its policy objectives, goals, and strategic plans. Because Administrator Furler acted pursuant to delegated authority, the board's power to act defined the scope of her own power to act on its behalf.

The events that led the employees to sue the board began in January 2014 when the annual county budget process was just getting underway. The Iowa Code requires elected or appointed officers and boards responsible for county offices and departments to submit itemized departmental budget estimates for the upcoming fiscal year to the county auditor or other designated official by January 15 of each year. *Id.* § 331.433. Department heads, county supervisors, and other officials meet to discuss the estimated departmental budgets at a series of budget workshops. The county auditor or designated official then compiles the departmental budgets into the overall county budget, which the board of supervisors may adjust based on overall county objectives. The Code provides the board must approve the overall county budget at a public meeting and the chairperson of the board must certify the budget no later than March 15. *Id.* §§ 24.9, .17.

Warren County Budget Director Katherine Rupp was responsible for coordinating the county budget for fiscal year 2015. To that end, Director Rupp conducted a series of budget workshops attended by the board, Administrator Furler, county department heads, and elected county officials in early January 2014. The county posted notice of the workshops in advance, and the workshops were open to the public. During these workshops, neither Administrator Furler nor the supervisors mentioned the possibility of reorganizing the county government or asked the department heads to reduce personnel costs. Likewise, when the supervisors discussed the budget at two additional open meetings later in January, they did not mention the possibility of reorganizing the county government.

On March 4, the board of supervisors held a public meeting and unanimously approved the budget for the upcoming fiscal year. Director Rupp gave a presentation in which she reviewed the budget and summarized the main budget issues facing the county. During that presentation, she noted personnel costs represented fifty-one percent of the proposed overall county budget—a slight increase over the prior year. Director Rupp attributed this change to rising health insurance costs, indicating that further cost increases resulting from the recent passage of federal healthcare legislation would need to be monitored and decisions made to minimize their effect. In addition, the county's future revenue was uncertain due to stagnant growth of the county's property tax base and the possibility the state would stop supplementing county revenue to cover declines caused by recent commercial property tax reform. However, Director Rupp also noted Warren County was the most populous county in the state without any debt and emphasized the proposed budget projected a significant decrease in expenditures

compared to updated estimates for fiscal year 2014. The board unanimously approved the budget, which included all county employees' present salaries and raises they were to receive during fiscal year 2015.

At the start of the budget process in January 2014, the board had not yet formalized a plan to eliminate any existing positions within the county workforce. Nevertheless, testimony at trial established that beginning in January, the supervisors and Administrator Furler worked together to develop such a plan. By that point, Supervisor Shull had already had numerous discussions with Administrator Furler about reorganizing the county workforce. He testified the other supervisors also began meeting individually with Administrator Furler in January to discuss the reorganization, though no two supervisors were present at the same time when these discussions occurred.

On February 4, the board passed a resolution at an open meeting appointing Supervisor Wilson to review the county workforce "to determine if restructuring and/or reorganization [was] necessary to improve efficiencies and services provided to Warren County residents." Supervisor Wilson was not present at the meeting because he was in Mexico. Nonetheless, Supervisors Shull and Yordi approved the resolution appointing Supervisor Wilson to review the reorganization issue, as Supervisor Wilson had already agreed in advance to undertake the task by conveying his assent to the other supervisors through Administrator Furler. The resolution appointing Supervisor Wilson to review the possibility of reorganizing the county government passed without meaningful discussion. Supervisor Wilson remained in Mexico for the rest of the month, however, and he delegated his duties under the resolution to Administrator Furler.

While Supervisor Wilson was away, Administrator Furler began the task of performing research and all the legwork associated with the reorganization. From the start and throughout the entire process, she consulted with the board's attorney, Michael Galloway. At trial, Administrator Furler claimed she performed her research regarding the reorganization mostly in March, but she admitted that she identified every employee who was eventually recommended for elimination in February. Evidence admitted at trial revealed that she also began working out the terms of the severance packages ultimately offered to the employees around the same time. Her handwritten notes show that she considered recommending each eliminated employee receive a severance package consisting of one week of pay for every three years of service and four months of health insurance. She also created a spreadsheet listing employees by their initials alongside their dates of hire, hourly rates, and health insurance costs to determine the cost of offering each eliminated employee a severance package consisting of one week of pay for every two years of service and six months of health insurance. Also during the month of February, Administrator Furler had lengthy discussions about the reorganization plans with her friend Frank Bonnett, former Indianola police chief and labor consultant. Administrator Furler had also begun having detailed conversations about how best to accomplish the reorganization with Supervisor Shull, including a few conversations during which Bonnett was present.

Upon Supervisor Wilson's return from Mexico in March, he met several times with Administrator Furler to discuss the work she had performed in his absence on the reorganization plan. Administrator Furler reduced her recommendations to writing with the help of Bonnett, whom she had formally retained to determine whether the county could

realize cost savings while continuing to provide the same level of service to county residents. Administrator Furler and Bonnett prepared a written report together and revised it around one hundred times. That written report came to be known as the Bonnett report. In the process of writing and revising the Bonnett report, Administrator Furler placed separate calls to Supervisors Shull and Wilson to get their opinions with respect to various issues discussed therein. However, testimony at trial did not establish how many such calls she made or how close in time they occurred.

On separate occasions during the period following Supervisor Wilson's return from Mexico, Administrator Furler discussed the reorganization plans and the Bonnett report with the individual supervisors. Administrator Furler and Bonnett met with Galloway, the board's attorney, and Supervisors Shull and Wilson. Administrator Furler also met with Supervisor Yordi. During these discussions, Administrator Furler allowed the individual supervisors to voice their thoughts and concerns on various topics. She then reported those thoughts and concerns to the other supervisors.

By this process, the board reached a compromise on which positions to eliminate. Supervisor Shull did not want to eliminate the board secretary position, and he voiced his concerns to Administrator Furler, who in turn shared them with Supervisors Yordi and Wilson. Supervisors Yordi and Wilson objected to retaining the board secretary position, however, because the board secretary and Supervisor Shull were friends and they did not want the public to perceive the board as playing favorites. When Administrator Furler reported their objections to Supervisor Shull, he agreed to compromise by eliminating the board secretary position.

Administrator Furler had similar conversations with the individual supervisors regarding other topics relevant to the reorganization, including the terms of the severance packages to be offered to employees in the positions being eliminated. At the end of each meeting Administrator Furler had with an individual supervisor, she would find out whether that supervisor was going to approve whatever aspect of the reorganization plan they had discussed during that particular meeting. Administrator Furler and the supervisors held all these meetings in private and without posting advance notice to the public.

At some point between March 13 and March 24, Administrator Furler distributed the final draft of the Bonnett report to the supervisors for review and confirmed with each supervisor that he intended to approve the plan described therein. The final draft recommended eliminating the maintenance department, the payroll department, and the positions held by the board secretary, the zoning director, an assistant engineer, and an engineering technician. It further recommended contracting out the maintenance, payroll, and land-surveying functions associated with the eliminated positions. With Galloway's help, Administrator Furler drafted letters and severance agreements for the employees targeted for elimination. She showed samples of the proposed severance agreements to the individual supervisors and confirmed with each that he would approve the terms appearing therein. Again, Administrator Furler and the supervisors held these meetings outside of the public view.

On March 25 and 26, Administrator Furler, Supervisor Wilson, and Galloway met with employees whose positions the Bonnett report recommended for elimination. They gave each employee a letter stating the following on official board letterhead:

Warren County is implementing a re-structuring of job responsibilities and duties in several departments effective March 26, 2014. Your position is being recommended for elimination. In lieu of a layoff, we are offering a severance package that must be approved by the Board of Supervisors.

The county is willing to provide a severance agreement to you of 1 week of pay for every 2 years of service plus six months health insurance coverage. In addition, you will be placed on paid administrative leave for 21 days to review the resignation/severance agreement. It is recommended you have a legal professional review the agreement.

The county thanks you for your service and believes the changes will create a more efficient and streamlined county government.

Only Supervisor Wilson's name and title appeared at the bottom of each letter.

In addition to a letter from Supervisor Wilson, each employee received a "Resignation of Employment and Release Agreement." The agreements provided that, in return for resigning from employment and releasing any claims they might have against the county, the employees would receive severance pay under the terms described in the letters, continued insurance coverage through October 31, and paid administrative leave until April 16. Administrator Furler and Galloway orally advised the employees the county was placing them on paid administrative leave for twenty-one days and their positions had been recommended for elimination by the board. According to Administrator Furler, Galloway also conveyed to the employees his confidence, based on his conversations with the supervisors, that the supervisors would accept those recommendations. The employees were sent home with their personal belongings and were not permitted to finish their shifts.

Word of the reorganization quickly spread among the county's other elected officials. On March 26, the other elected officials met with Supervisor Shull and Administrator Furler to find out how the county

would provide residents with necessary services going forward and why the board had not notified them of any potential problems with the county budget. The elected officials suggested that perhaps they could have helped the supervisors avoid the layoffs had the board advised them of the situation. Administrator Furler responded by explaining that the supervisors could not talk to anybody about the reorganization and needed everything to be kept quiet. Supervisor Shull portrayed the layoffs as something the county had to do. Despite the officials' concerns about continuity of services for county residents, within days outside vendors were handling the payroll and maintenance duties previously performed by employees in the eliminated positions.

On April 16, six employees filed suit against the board, the county, and the individual supervisors, claiming the board's actions violated the open meetings law and seeking injunctive and other remedies. Two days after the employees filed suit, the board held an open meeting on April 18. The agenda appearing on the "special meeting notice" the board posted prior to the meeting listed two items: (1) "Consider Recommendation of Re-organization and Approval of Reduction-in-Force" and (2) "Consideration and Action on Severance Agreements."

The open meeting on April 18 lasted approximately twenty minutes. Minutes before it began, Administrator Furler placed copies of the Bonnett report, which had not previously been released to the public, on a table at the back of the room. She also gave a copy to each supervisor and the county auditor. Once the meeting began, Administrator Furler spoke briefly from notes she prepared in advance about the severance packages offered to the employees in the eliminated positions, noting that five employees had opted to sign resignation agreements and six employees had not. Galloway then made a short

presentation contending the board had complied with the open meetings law.

Without discussion, the supervisors unanimously passed two resolutions at the open meeting. The first resolution approved the recommendations contained in the Bonnett report. The second resolution approved the severance agreements signed by five of the employees whose positions the county had eliminated. The board did not allow any public comments.

On May 5, the county issued COBRA notices to the employees who elected not to sign the resignation agreements. The notices listed "termination" as the employees' COBRA-qualifying event and listed the date that event had occurred as April 16, even though the board did not actually vote to approve the terminations at an open meeting until April 18.

The district court tried the case in July. The judge declined to award relief to the terminated employees, finding the employees failed to prove by a preponderance of the evidence that a majority of the board deliberated about the reorganization in violation of the open meetings law.

The district court first addressed the employees' allegations that a majority of the supervisors deliberated the reorganization during closed-door, in-person gatherings witnessed by the board secretary. Former board secretary Shelly Vander Tuig testified at trial that several closed-door meetings took place between a majority of the supervisors and Administrator Furler in January and February 2014. The court pointed out that on cross-examination, Vander Tuig admitted she was not present at those gatherings and was never told what was discussed during them. In addition, Administrator Furler and the supervisors all

denied a majority of the supervisors had ever met to discuss county business and understood their doing so would have constituted a violation of the open meetings law. The court consequently found the employees failed to prove by a preponderance of the evidence that a majority of the board deliberated about the reorganization in person during those closed-door gatherings.

The district court next addressed the question of whether the supervisors violated the open meetings law by using Administrator Furler as a conduit to deliberate the details of the reorganization. The court concluded the evidence established the supervisors deliberated the reorganization through Administrator Furler, rejecting the notion that the board distributed the severance agreements before the supervisors engaged in discussions and evaluative processes in arriving at a decision or policy.

The district court then turned to the question of whether the evidence established a gathering of a majority of the board triggered the requirements of openness and public notice under the open meetings law. Interpreting Iowa Code section 21.2(2), the district court found the supervisors did not violate the open meetings law by using a third party to deliberate the reorganization because a majority of the supervisors did not gather as required by the definition of meeting in the Code.

The employees appeal.

**II. Issues.**

Neither party appealed the district court finding that the evidence established the supervisors deliberated the details of the reorganization through Administrator Furler. Therefore, we do not address that issue in this opinion. Rather, we address the following issues in this appeal. First, whether substantial evidence supports the district court finding

that a majority of the supervisors never deliberated the reorganization during the closed-door, in-person gatherings observed by the board secretary. Second, whether the district court correctly interpreted section 21.2(2) when it concluded the gatherings attended by the individual supervisors and the county administrator did not constitute gatherings of a majority of the members of the board.

### III. Scope of Review.

Actions to enforce the open meetings law are ordinary, not equitable, actions. *Schumacher v. Lisbon Sch. Bd.*, 582 N.W.2d 183, 185 (Iowa 1998). In such actions, we accord a trial court's factual findings the same degree of deference we accord a jury's special verdict. *See* Iowa R. App. P. 6.907. Thus, factual findings by the trial court are binding if substantial evidence supports them. *See Schumacher*, 582 N.W.2d at 185; *Tel. Herald, Inc. v. City of Dubuque*, 297 N.W.2d 529, 533 (Iowa 1980). Substantial evidence supports a factual finding when the finding "may be reasonably inferred from the evidence presented." *Vaughan v. Must, Inc.*, 542 N.W.2d 533, 538 (Iowa 1996).

Additionally, this appeal requires us to construe the Iowa open meetings law. *See* Iowa Code §§ 21.2(2), .3. We review questions of statutory construction for correction of errors at law. *Estate of Ryan v. Heritage Trails Assocs., Inc.*, 745 N.W.2d 724, 728 (Iowa 2008).

### IV. Whether Substantial Evidence Supports the District Court Finding that a Majority of the Supervisors Never Deliberated the Reorganization During Closed-Door, In-Person Gatherings Witnessed by the Former Board Secretary.

The district court implicitly found that any closed-door, in-person gatherings of a majority of the supervisors the board secretary witnessed were not *meetings* because they did not involve *deliberation or action* upon matters within the scope of the board's policy-making authority.

*See* Iowa Code § 21.2(2). When reviewing a claim that substantial evidence does not support a district court finding, we are required to view the evidence in the light most favorable to the judgment and liberally construe the court's findings to uphold, rather than defeat, the result reached. *State v. Dohlman*, 725 N.W.2d 428, 430 (Iowa 2006). Evidence supporting a district court finding is not insubstantial merely because we may draw a different conclusion from it. *Iowa Beta Chapter of Phi Delta Theta Fraternity v. State*, 763 N.W.2d 250, 257 (Iowa 2009). The crucial question in determining whether substantial evidence supports a district court finding is not whether the evidence would support a different finding, but whether the evidence supports the finding actually made. *Id.*

At trial, former board secretary Vander Tuig testified she observed a majority of the board attend closed-door, in-person gatherings on numerous occasions in the board offices in January and February 2014. Hers was the only eyewitness testimony offered in support of the employees' claim that the supervisors deliberated the reorganization during closed-door, in-person gatherings at which a majority of the supervisors were physically present. But as the district court observed, Vander Tuig admitted she had no first- or second-hand knowledge regarding the subject matter of the discussions taking place during any closed-door, in-person gatherings. She admitted she never heard what the supervisors discussed, nor did anyone tell her what the supervisors discussed after the fact.

The supervisors and the county administrator—the individuals alleged to have been present during the improper closed-door deliberations—testified they understood the open meetings law and had developed an elaborate methodology of communicating with each other

through Administrator Furler in order to avoid triggering the open meetings requirements. Furthermore, they all denied any discussion of board business occurred in any closed meeting attended by a majority of the supervisors.

The district court weighed the testimony of the former board secretary against the testimony of the supervisors and the county administrator, credited the latter, and found the supervisors never deliberated the reorganization during any closed-door, in-person meetings the board secretary witnessed. As the finder of fact, weighing the proffered testimony and determining its credibility was the district court's duty. *Second Injury Fund v. Braden*, 459 N.W.2d 467, 471 (Iowa 1990). Although the district court might have made a different determination, substantial evidence supports the determination it made. Therefore, we affirm the district court finding that a majority of the supervisors never deliberated the reorganization during any closed-door, in-person gathering witnessed by the former board secretary.

**V. Whether the District Court Correctly Concluded the Serial Gatherings Attended by the Individual Supervisors and the County Administrator Did Not Constitute a "Gathering . . . of a Majority of the Members" of the Board Under Iowa Code Section 21.2(2).**

This case requires us to interpret the definition of "meeting" contained in section 21.2(2) of the Code. It provides,

> "*Meeting*" means a gathering in person or by electronic means, formal or informal, of a majority of the members of a governmental body where there is deliberation or action upon any matter within the scope of the governmental body's policy-making duties. Meetings shall not include a gathering of members of a governmental body for purely ministerial or social purposes when there is no discussion of policy or no intent to avoid the purposes of this chapter.

Iowa Code § 21.2(2).

The district court found the board of supervisors deliberated various details of the reorganization of the county government through Administrator Furler. Neither party appealed this finding. It is also uncontested that the reorganization of county government is a matter within the scope of the board's policy-making duties. Thus, these aspects of the definition in section 21.2(2) are not at issue in this appeal. Instead, at issue is the meaning of the phrase "a gathering in person or by electronic means, formal or informal, of a majority of the members of a governmental body." *Id.*

The supervisors argue a gathering within the meaning of section 21.2(2) occurs only when a majority of the members of a governmental body personally assemble in close temporal proximity. In contrast, the employees contend that in order to reach a solid consensus on the reorganization plan the supervisors necessarily had to gather in order to deliberate as a body. The *amici curiae* contend Administrator Furler acted as each supervisor's agent by conveying his thoughts and opinions to the other supervisors. Thus, they contend each gathering between Administrator Furler and an individual supervisor was the legal equivalent of a gathering between two or three supervisors.

When interpreting a statute, our goal is to determine legislative intent. *Auen v. Alcoholic Beverages Div.*, 679 N.W.2d 586, 590 (Iowa 2004). Before resorting to rules of statutory construction, we determine whether the language chosen by the legislature is ambiguous. *Zimmer v. Vander Waal*, 780 N.W.2d 730, 733 (Iowa 2010). A statute is ambiguous if reasonable persons can disagree on its meaning. *State v. Wiederien*, 709 N.W.2d 538, 541 (Iowa 2006). Ambiguity may arise regarding the meaning of particular words or the general scope and meaning of a statute. *Holiday Inns Franchising, Inc. v. Branstad*, 537 N.W.2d 724, 728

(Iowa 1995). In addition, "when a literal interpretation of a statute results in absurd consequences that undermine the clear purpose of the statute, an ambiguity arises." *Sherwin-Williams Co. v. Iowa Dep't of Revenue*, 789 N.W.2d 417, 427 n.8 (Iowa 2010). We interpret statutes to reflect common law principles existing at the time of their enactment unless the language the legislature chose specifically negates the common law. *State v. Dullard*, 668 N.W.2d 585, 595 (Iowa 2003).

Regarding the purpose of the open meetings law contained in chapter 21 of the Iowa Code, the legislature has indicated,

> This chapter seeks to assure, through a requirement of open meetings of governmental bodies, that the basis and rationale of governmental decisions, as well as those decisions themselves, are easily accessible to the people. Ambiguity in the construction or application of this chapter should be resolved in favor of openness.

Iowa Code § 21.1. Our caselaw affirms this legislative intent. *See, e.g.*, *Tel. Herald*, 297 N.W.2d at 532.

In *Telegraph Herald*, we recognized the "legislature's apparent intent that temporal proximity exist among members of the governmental body" in order for a "meeting" subject to the open meetings requirements to take place. *Id.* at 534. However, the question we faced in that case is distinguishable from the question we face in this case. In the former, we considered whether an open meetings violation occurred when members of a city council interviewed applicants for the position of city manager during a series of gatherings at which less than a majority of the council members were present at various times and places. *Id.* at 531–34. The specific theory we considered was whether serial submajority gatherings could constitute an informal meeting to which the open meetings law applies. *Id.* at 532–34.

We concluded the serial submajority gatherings did not violate the open meetings law because they did not constitute gatherings to which open meetings requirements applied for two reasons. First, the council members obviously did not deliberate regarding whom they would actually hire during the interviews.[1] *Id.* at 532–33. Second, in interpreting section 21.2(2), we concluded that in order for serial submajority gatherings to collectively constitute a meeting of the majority of a governmental body and trigger the open meetings requirements, a majority of the members must deliberate in temporal proximity to each other. *Id.* at 533–34. Because there was no demonstration of temporal proximity among the gatherings at which the interviews took place, we concluded they did not trigger the open meetings requirements. *See id.*

Our resolution to the question we faced in *Telegraph Herald* does not answer the question we face in this case. First, in this case, there is no question that the board members collectively deliberated during the meetings between the individual board members and the county administrator. As previously noted, the district court found that they did, and the parties do not dispute that finding. Second, the employees do not claim the open meetings requirements were triggered by serial submajority gatherings or assert that serial meetings attended by the

---

[1]Deliberation generally involves "discussion and evaluative processes in arriving at a decision or policy." *Hettinga v. Dallas Cty. Bd. of Adjustment*, 375 N.W.2d 293, 295 (Iowa Ct. App. 1985) (quoting 1979 Op. Iowa Att'y Gen. 164, 166, 1979 WL 21166, at *3). Although a gathering may be "purely ministerial" if members of a body assemble simply to receive information without discussing policy or intending to avoid the purposes of the open meetings law, ministerial activities may develop into deliberation if the members of a governmental body "engage in any discussion that focuses at all concretely on matters over which they exercise judgment or discretion." *Id.* (quoting Op. Iowa Att'y Gen. No. 81–7–4(L) (July 6, 1981), 1981 WL 178383, at *6).

individual board members collectively constituted a meeting within the meaning of the statute.

Rather, the employees claim the open meetings requirements were triggered when a majority of the board intentionally deliberated the reorganization using the county administrator as their conduit because doing so was legally equivalent to deliberating the reorganization during a gathering at which a majority of the board was personally present. In other words, they contend each meeting between an individual board member and the county administrator during which the administrator deliberated the reorganization plan at the behest of another board member legally constituted an informal in-person gathering of a majority of the board involving deliberation concerning matters within the scope of the board's policy-making duties.[2] *See* Iowa Code § 21.2(2). If the employees' interpretation of section 21.2(2) is correct, each gathering attended by a board member and the county administrator during which the administrator deliberated the reorganization while acting on behalf of another board member legally constituted a meeting to which the open meetings law applied. The first board member was physically present in person, and the second board member was physically present by virtue of the county administrator acting as his agent. We have yet to address this scenario under our open meetings law.

Were we to assume the legislature was unfamiliar with agency principles when it enacted the open meetings law, we might construe the term "gathering" narrowly to conclude the open meetings requirements

---

[2]The Warren County Board of Supervisors is a three-person board. Thus, a majority of the board deliberates whenever two members of the board engage in "discussion and evaluative processes in arriving at a decision or policy." *Hettinga*, 375 N.W.2d at 295 (quoting 1979 Op. Iowa Att'y Gen. at 166, 1979 WL 21166, at *3).

apply only to face-to-face deliberations during which a majority of the members of a governmental body are personally physically present and to electronic or serial submajority deliberations among a majority of members occurring in close temporal proximity. However, such a narrow construction of the term would clearly be at odds with the intended scope and purpose of our open meetings law "to assure, through a requirement of open meetings of governmental bodies, that the basis and rationale of governmental decisions, as well as those decisions themselves, are easily accessible to the people." *See id.* § 21.1. Adopting the interpretation of section 21.2(2) urged by the board and its members would result in absurd consequences undermining the clear purpose of the open meetings law. We therefore conclude the statute is ambiguous with respect to the question of whether governmental bodies may utilize agents to deliberate on their behalf without triggering the open meetings requirements. *See Sherwin-Williams*, 789 N.W.2d at 427.[3]

---

[3]The district court and the board note our legislature twice considered, but failed to pass, proposed bills that would have amended section 21.2(2) to address serial submajority gatherings. Specifically, the legislature failed to pass two bills that each proposed amending section 21.2(2) to add the following sentence:

> A meeting includes a series of gatherings of members who constitute less than a majority of the members at each gathering, but who collectively constitute a majority of the members, where the series of gatherings includes deliberation or action upon any matter within the scope of the governmental body's policy-making duties.

*See* S.F. 282, 83rd G.A., 1st Sess. § 6 (Iowa 2009); H.F. 372, 81st G.A., 1st Sess. § 1 (Iowa 2005). Relying on the legislature's failure to amend section 21.2(2), the board accuses the employees of asking this court to legislate from the bench and change the definition of meeting in a way the legislature was unwilling to do. Essentially, the board seeks to rely on the presumption that legislative silence signals acquiescence in an existing interpretation of a statute. *See Gen. Mortg. Corp. v. Campbell*, 258 Iowa 143, 152, 138 N.W.2d 416, 421 (1965). However, the legislature's failure to pass proposed bills addressing serial submajority gatherings is irrelevant to the question of whether a member of a governmental body may use an agent to deliberate on his or her behalf in order to avoid triggering the open meetings requirements.

We believe resolving this ambiguity requires us to consider whether the common law of agency influences the proper interpretation of section 21.2(2). The legislature clearly instructed that ambiguities arising in construing the open meetings law should be resolved in favor of openness. Iowa Code § 21.1. We also recognize that well-settled common law principles predating the enactment of a statute may be instructive in clarifying the ambiguities arising when we interpret it. *See State v. McIver*, 858 N.W.2d 699, 704 (Iowa 2015) (citing 2A Norman J. Singer & Shambie Singer, *Statutes and Statutory Construction* § 45:2, at 16–17 (7th ed. rev. 2014)); *see also Dullard*, 668 N.W.2d at 595. The legislature generally anticipates that courts will turn to the common law to resolve statutory ambiguities in statutory text. In fact, the legislature has instructed us to do precisely that. *See* Iowa Code § 4.6(4). Accordingly, because the concept of agency predates the enactment of the open meetings law and accounting for that concept in construing the open meetings law is consistent with the object the legislature sought to attain by its enactment, we conclude agency principles are relevant in the context of applying section 21.2(2).

We have long recognized the general principle that members of a public board "may authorize performance of ministerial or administrative functions" but cannot delegate "matters of judgment and discretion." *Bunger v. Iowa High Sch. Athletic Ass'n*, 197 N.W.2d 555, 559–60 (Iowa 1972). The open meetings statute reflects the reality that deliberation upon matters of public policy involves judgment and discretion. *See* Iowa Code § 21.2(2). Thus, our conclusion that public bodies cannot use agents to deliberate matters of public policy without triggering the open meetings law is consistent with this principle. In contrast, were we to reach the opposite conclusion, we would encourage members of

governmental bodies to enlist agents to deliberate matters of public policy on their behalf outside the public view in order to purposefully evade the open meetings law.

Because we conclude agency principles are relevant to determining whether a gathering satisfies the statutory definition of meeting in section 21.2(2), we conclude the legal equivalent of an in-person gathering of a majority of the members of a public body takes place whenever a majority of the members of a governmental body meet, whether each member attends personally or through an agent. *See, e.g.*, *Andrews v. Young Men's Christian Ass'n of Des Moines*, 226 Iowa 374, 380, 284 N.W. 186, 190 (1939) ("He who acts through another acts by and for himself."). Indeed, the concept of agency is so fundamental to the common law that some courts have *assumed* a gathering personally attended by fewer public officials than is required to satisfy a statutory definition of "meeting" may nonetheless constitute a meeting whenever a sufficient number of public officials attend the gathering by virtue of their agents. *Claxton Enter. v. Evans Cty. Bd. of Comm'rs*, 549 S.E.2d 830, 834–35 (Ga. Ct. App. 2001) (stating that "a meeting is required to be open only when a quorum of a governing body or its agents have gathered" though the statute defined "meeting" as "the gathering of a quorum of the members of the governing body of an agency or of any committee . . . at a designated time and place . . . at which official action is to be taken" (quoting Ga. Code Ann. § 50-14-1(a)(2) (1999))); *State ex rel. Newspapers, Inc. v. Showers*, 398 N.W.2d 154, 164–65 (Wis. 1987) ("Common sense also tells us . . . that if proxies are present so as to realistically make-up a majority, the Open Meeting Law applies.").

Generally, an agency relationship exists when an agent has actual or apparent authority to act on behalf of a principal and both principal

and agent have mutually manifested assent to create it.[4]  *See Soults Farms, Inc. v. Schafer*, 797 N.W.2d 92, 100 (Iowa 2011); *C & J Vantage Leasing Co. v. Wolfe*, 795 N.W.2d 65, 79 (Iowa 2011).  Actual authority exists when a principal has expressly or by implication granted an agent authority to act on his or her behalf.  *Soults Farms*, 797 N.W.2d at 102.  A party may prove a principal granted an agent actual authority to act on his or her behalf by circumstantial evidence.  *Id.*  Manifestations of assent include written or spoken words or other conduct and may be inferred from surrounding facts and circumstances.  *Id.* at 101.  For example, an agent may manifest assent merely by performing actions he or she has been empowered by the principal to perform or carrying out actions that objectively benefit the principal.  *Id.*  "The party asserting an agency relationship must prove its existence by a preponderance of the evidence."  *Id.* at 100.

Here, the record amply supports the district court finding that the supervisors intentionally developed a "sophisticated methodology of communicating effectively with one another" about county business outside the public view "by using Administrator Furler as a conduit."  As the district court found, the record shows Administrator Furler and the supervisors understood that it would trigger the open meetings requirements if two or more supervisors met in person to discuss the reorganization or other county business.  Thus, the record clearly supports the district court's conclusion that the supervisors deliberately used Administrator Furler to flesh out the details of the reorganization

---

[4]We have never considered whether agency may exist by virtue of apparent authority in the municipal government context, but we need not address that issue in this case.  *See Dillon v. City of Davenport*, 366 N.W.2d 918, 923 (Iowa 1985) (declining to reach the apparent authority issue).

plan and resolve conflicts among themselves about how best to accomplish the reorganization outside the public view.

The record also supports the district court finding that the supervisors used Administrator Furler to deliberate the reorganization plan in that manner because they knew the plan would be controversial and anticipated conflict and discomfort would result if they discussed it in a public forum. As the testimony recounted at length by the district court clearly demonstrates, the supervisors actively avoided discussing the reorganization in public meetings by having Administrator Furler meet with them individually to gather and convey information they intentionally shared with her in order to allow her to facilitate their communication with each other. By this method, the supervisors compromised regarding key details of the reorganization plan, including which positions to eliminate and the terms of the severance packages to be offered to eliminated employees.

Substantial evidence supports the findings by the district court. *See Vaughan*, 542 N.W.2d at 538. Using Administrator Furler to conduct shuttle diplomacy and deliberate county business worked so well for the supervisors, they managed to implement the restructuring of the county government without deliberating a single detail of the reorganization plan during a public meeting.

Although we agree with the district court's assessment of the facts, the court made a legal error in interpreting section 21.2(2). Consequently, it did not apply agency principles in determining whether the actions of the supervisors and the county administrator violated the open meetings law. The employees urge us to conclude the district court implicitly found the administrator acted as an agent of one or more supervisors in conducting shuttle diplomacy among them on their behalf.

After all, if the administrator never acted as an agent of one or more of the supervisors during any of her conversations with the other supervisors, how could the supervisors have deliberated every detail of the reorganization plan and implemented it prior to the public meeting?

We would be well within our power to find an agency relationship existed on a de novo review. However, in this appeal we review the district court's ruling for correction of errors at law. Because the district court erroneously interpreted section 21.2(2) and did not make the factual findings necessary to determine whether the gatherings attended by the individual supervisors and the county administrator constituted meetings subject to the open meetings requirements under a proper interpretation of the statute, we must remand the case to the district court.

On remand, the district court should determine the nature and extent of the actual authority the supervisors granted Administrator Furler when they intentionally used her to deliberate the reorganization plan outside the public view in an attempt to avoid triggering the open meetings requirements. *See Mayrath Co. v. Helgeson,* 258 Iowa 543, 547, 139 N.W.2d 303, 305–06 (1966) (acknowledging that "usually the nature and extent of the authority of an agent, and whether his acts . . . are within the scope of his authority, are questions of fact"). If the court finds an agency relationship existed and Administrator Furler acted within the scope of her authority in helping the supervisors to deliberate the details of reorganization, it should apply section 21.2(2) in accordance with this opinion to conclude that a violation of the open meetings law occurred.

The board argues we should not interpret section 21.2(2) in this manner because treating public employees as the agents of public

officials would in effect prohibit communication between employees and elected officials outside public meetings. We disagree. The open meetings law permits members of a governmental body to discuss with its employees matters concerning its operation.

In *Telegraph Herald*, we rejected the contention that a prohibited closed meeting occurs any time a member of a governmental body discusses government business with another individual. 297 N.W.2d at 534. In doing so, we concluded,

> The composite rationale which may be distilled from [judicial decisions addressing open meetings laws] is that such laws do not prohibit gatherings of less than a majority of the governing body where decisions are not made and official actions are not taken and that the right of free speech might be violated by a law forbidding any discussion by public officers between meetings. Activities of a governmental body's individual members to secure information to be reported and acted upon at an open meeting ordinarily do not violate sunshine statutes. Any other rule would hamstring the progress of governmental bodies, and impose intolerable time burdens on unpaid officeholders.

*Id.* at 533–34 (footnote omitted).

If the individual board members and the county administrator had gathered merely for the purpose of gathering information or discussing the various options available to the board in implementing the reorganization or achieving government efficiency, a meeting under section 21.2(2) would not have occurred. However, the district court found much more than general discussion or information exchange took place. The district court expressly found the supervisors intentionally used the county administrator to deliberate concerning matters of public policy by having her engage in "discussion and evaluative processes in arriving at a decision." *See Hettinga v. Dallas Cty. Bd. of Adjustment*, 375

N.W.2d 293, 295 (Iowa Ct. App. 1985) (quoting 1997 Op. Iowa Att'y Gen. 164, 166, 1979 WL 21166, at *3).

In fact, the supervisors concede they intentionally used the county administrator to facilitate discussion amongst themselves concerning various aspects of the reorganization and to negotiate an agreement concerning the precise details of the reorganization plan, as evidenced by the fact that the board never discussed the plan at an open meeting before they actually implemented it. The legislature clearly intended public bodies subject to the open meetings law to deliberate the basis and rationale for important decisions such as these, as well as the decisions themselves, during open meetings. Iowa Code § 21.1.

Thus, we conclude district courts must apply agency principles in determining whether an in-person gathering satisfies the statutory definition of meeting in section 21.2(2). Accordingly, the open meetings requirements apply to all in-person gatherings at which there is deliberation upon any matter within the scope of the policy-making duties of a governmental body by a majority of its members, including in-person gatherings attended by members of a governmental body through agents or proxies.

## VI. Conclusion and Disposition.

In summary, the open meetings law does not prohibit discussions between members of a governmental body and its staff to exchange ideas and gather information in order for the body to act upon an issue during an open meeting. However, the open meetings law does prohibit the majority of a governmental body gathering in person through the use of agents or proxies to deliberate any matter within the scope of its policy-making duties outside the public view. The open meetings law is

intended to safeguard free and open democracy by ensuring the government does not unnecessarily conduct its business in secret.

Because the district court incorrectly interpreted section 21.2(2) in applying the open meetings law, we reverse its judgment and remand the case. On remand, the district court should make the necessary factual findings and apply the proper interpretation of the statute in a manner consistent with this opinion.

If the district court finds the supervisors acted through an agent when they deliberated the reorganization, the district court should grant the employees appropriate relief. We are aware Iowa Code section 21.6(3)(*c*) allows the district court to void any action taken by the board if "the court finds under the facts of the particular case that the public interest in the enforcement of the policy of [chapter 21] outweighs the public interest in sustaining the validity of the action taken in the closed session." However, in considering what relief is appropriate under the circumstances of this case, the court should note that the board eventually approved the reorganization plan at an open meeting and should consider whether this subsequent approval complied with the open meetings requirements and cured any violation of the open meetings law. *See Valley Realty & Dev., Inc. v. Town of Hartford*, 685 A.2d 292, 296 (Vt. 1996) (holding a land purchase made in violation of an open meetings law should not be voided because its ratification in a subsequent meeting complying with open meetings requirements cured the violation of the open meetings law).

**REVERSED AND REMANDED WITH DIRECTIONS.**

Cady, C.J., Hecht and Appel, JJ., join this opinion. Waterman, J., files a dissenting opinion in which Mansfield and Zager, JJ., join. Mansfield, J., files a separate dissenting opinion in which Waterman and Zager, JJ., join.

**WATERMAN, Justice (dissenting).**

I respectfully dissent. I would affirm the well-reasoned district court decision that correctly applied the plain language of Iowa Code section 21.2(2) (2013) and our precedent. The majority opinion today replaces a clear, easy-to-follow rule with a vague standard that will invite costly litigation and deter diligent public officials from conferring with administrators to prepare for public meetings. The majority adopts a new agency theory at odds with Iowa municipal law and never adopted by any other appellate court. This agency theory treats an unelected administrator as an elected county supervisor in order to find the "majority" required to trigger the open meetings law. This untested and novel agency theory was not raised by plaintiffs in district court or on appeal. We should not change the rules after the game is played and then allow a retrial on a theory that was not preserved.

The majority also gratuitously suggests that actions taken at improper closed meetings can simply be ratified at an open meeting. Those dicta may undermine an important statutory remedy that deters violations of the open meetings law—a judicial declaration that the action taken behind closed doors is void. Ironically, the majority's goal of furthering transparency in local government actions could have the opposite effect.

I agree with the majority that substantial evidence supports the district court's finding that the individual Warren County supervisors "deliberated" about the challenged reorganization through serial private one-on-one meetings with Administrator Furler acting as a "conduit" who relayed messages between supervisors. Based on the documents executed before the public meeting, the details of the reorganization were

approved and finalized privately subject to ratification at the public meeting. But the district court correctly concluded the supervisors did not violate the open meetings law because a majority of the supervisors never gathered in person as required by the statutory definition, which provides:

> "*Meeting*" means *a gathering in person* or by electronic means, formal or informal, of a majority of the members of a governmental body where there is deliberation or action upon any matter within the scope of the governmental body's policy-making duties. Meetings shall not include a gathering of members of a governmental body for purely ministerial or social purposes when there is no discussion of policy or no intent to avoid the purposes of this chapter.

Iowa Code § 21.2(2) (second emphasis added). It is undisputed that the supervisors took no binding vote on the reorganization until the public meeting.

The majority acknowledges "our legislature twice considered, but failed to pass, proposed bills that would have amended section 21.2(2) to address serial submajority gatherings." Yet, the majority effectively rewrites the statutory definition of "meeting" to prohibit informal practices that the legislature has allowed to continue since our unanimous decision thirty-five years ago in *Telegraph Herald, Inc. v City of Dubuque*, 297 N.W.2d 529, 533–34 (Iowa 1980) (interpreting the statute to allow private in-person gatherings of less than a majority).

I would defer to the elected branches to redefine the requirements of the open meetings law. That is their policy decision to make. The Iowa legislature has clearly acquiesced in our interpretation of chapter 21 in *Telegraph Herald*. *See Ackelson v. Manley Toy Direct, L.L.C.*, 832 N.W.2d 678, 688 (Iowa 2013) ("[W]e presume the legislature is aware of our cases that interpret its statutes. When many years pass following

such a case without a legislative response, we assume the legislature has acquiesced in our interpretation." (Citation omitted.)).

Unfortunately, no amici curiae briefs were filed on behalf of the Iowa State Association of Counties, the Iowa League of Cities, the Iowa Association of School Boards, or the executive branch of state government to address the practical problems that may result from the majority's new interpretation. Today's decision can be and should be limited to its facts—a *fait accompli* arranged behind closed doors. My concern, however, is that the decision will have a chilling effect on well-intentioned public officials who consider themselves duty-bound to get up to speed on pending matters before public meetings. Let us consider the dilemma now faced by public officials who want to do their homework by sitting down with an administrator privately, rather than prolonging a public meeting. May they continue to confer privately with staff or in small groups? Or, if they do, could someone sue them for violating chapter 21, putting their personal assets at risk for a judgment for attorney fees? Chapter 21 provides that statutory penalties and attorney fees may be imposed on elected officials *personally* unless they establish a defense of reasonable good faith or reliance on a court opinion or advice of counsel. *See* Iowa Code § 21.6(3) (providing remedies for violations of chapter 21); *City of Postville v. Upper Explorerland Reg'l Planning Comm'n*, 834 N.W.2d 1, 7 (Iowa 2013) ("Generally, Iowa law makes members of governmental bodies subject to liability for [chapter 21] violations."); *cf. City of Riverdale v. Diercks*, 806 N.W.2d 643, 654–59 (Iowa 2011) (discussing the good-faith defense to fee awards under the Open Records Act, Iowa Code chapter 22). Elected officials always face the consequences of unpopular or controversial decisions at the ballot

box. But potential personal liability for thousands of dollars in attorney fees is a different matter.

In my view, we correctly interpreted section 21.2(2) over three decades ago in *Telegraph Herald.* In that case, the local newspaper and its publisher sued the City of Dubuque and individual members of the city council, alleging that private interviews of applicants for the city manager position violated the open meetings law. 297 N.W.2d at 531. City council members alone or in pairs personally interviewed the seven finalists behind closed doors. *Id.* The district court ruled that these interviews did not violate the open meetings law "because less than the majority of the council were present at each interview." *Id.* at 532. We affirmed, holding that "the legislature's definition of 'meeting' . . . requires a gathering (in person or by electronic means) of a majority of the members of a governmental body." *Id.* We noted "[t]he attorney general ha[d] reached the same interpretation." *Id.* at 533 n.1. We expressly rejected the argument that the statute was violated by the interviews conducted by less than a majority of the council. *Id.* at 534. We noted the legislature required "that temporal proximity exist among members of the governmental body" to constitute a "meeting." *Id.* Today's decision overrules that holding. I would honor stare decisis.

The majority purports to distinguish *Telegraph Herald* by stating, "[T]he council members [in that case] obviously did not deliberate regarding whom they would actually hire during the interviews." We did not say that in *Telegraph Herald.* Rather, we noted the "[t]rial court did not find an intent to violate the act" and "concluded the council members were, at all times, acting reasonably on their corporation counsel's advice." *Id.* at 533. We also noted that the legislature's definition of meeting required *both* a gathering of a majority and deliberation. *Id.* at

532. We squarely held the statute is not violated when fewer than a majority meet. *Id.* at 533. The district court correctly understood and applied the statute and *Telegraph Herald* when it stated:

> The definition of meeting in section 21.2(2) plainly states that a gathering of the majority of the members of the governmental body must occur. *Telegraph Herald* interpreted the legislature's definition as requiring temporal proximity. Here, there is no proof of temporal proximity among the Supervisors when they met with Administrator Furler to discuss restructuring the County government. In fact, it appears as though deliberate efforts were made to insure that there was no temporal proximity among the discussions between Administrator Furler and the individual Supervisors. . . . Therefore, there was no "*gathering* (in person or by electronic means) of a majority of the members." The Court is bound by the words chosen by the legislature, not by what it thinks the legislature should have said.

We applied *Telegraph Herald* in *Wedergren v. Board of Directors*, 307 N.W.2d 12, 18 (Iowa 1981). In that case, we addressed a superintendent's challenge to his termination by a school board. *Id.* at 15. He contended three members of the five-member school board violated the open meetings law when they discussed his termination in phone calls with each other. *Id.* at 18. We reiterated that "[t]he legislature has decided to extend coverage of the law only to a gathering of a majority of the members of a governmental body." *Id.* We concluded that phone calls between two members were not a meeting subject to the requirements of chapter 21 and that "[t]he only possible violation of the open meetings law occurred" when three members (a majority) participated in a conference call to discuss the role of outside counsel in the termination. *Id.* at 18–19. We thereby squarely rejected the theory that serial meetings or discussions between fewer than a majority of the board can violate the open meetings law. The majority reaches a

different result today without even acknowledging *Wedergren*. Again, I would honor stare decisis.

We noted in *Telegraph Herald* that ambiguities in the open meetings law are to be construed in favor of openness but concluded the plain meaning of the statutory definition of "meeting" meant a gathering of a majority of the council, not smaller groups. 297 N.W.2d at 532–33. That interpretation is supported by dictionary definitions:

> **meeting,** *n.* (14c) *Parliamentary law.* A single official gathering of people to discuss or act on matters in which they have a common interest; esp., the convening of a deliberative assembly to transact business. ● A deliberative assembly's meeting begins with a call to order and continues (aside from recesses) until the assembly adjourns.

*Black's Law Dictionary* 1131 (10th ed. 2014). *Webster's Third New International Dictionary* defines "meeting" as "a gathering for business, social, or other purposes." *Webster's Third New International Dictionary* 1404 (unabr. ed. 2002). "Gathering" is defined as "a coming together of people in a group (as for social, religious, or political purposes)." *Id.* at 940. Dictionary definitions contradict the majority's interpretation that a meeting of a majority of supervisors could occur with only one supervisor present. Importantly, the majority upholds the district court's factual finding that no two supervisors gathered in the same place at the same time to deliberate about the reorganization in private. That factual finding should be dispositive and forestalls the legal conclusion that defendants violated the open meetings law.

The majority erroneously invokes the absurd results doctrine to assert the statutory definition of "meeting" is ambiguous. We recently and unanimously reiterated that the absurd results doctrine should be used sparingly lest we contradict legislative intent expressed in plain language:

> Establishing absurdity in an unambiguous statute is difficult for good reason. We have explained that "we will not ignore clear legislative language merely because it leads to a result that seems contrary to the court's expectations." The express language must produce a result that is "*demonstrably at odds* with the intention" of the legislature.

*In re J.C.*, 857 N.W.2d 495, 503 (Iowa 2014) (citations omitted) (quoting *Sherwin-Williams Co. v. Iowa Dep't of Revenue*, 789 N.W.2d 417, 427, 429 (Iowa 2010)). And I find nothing absurd about limiting the open meeting requirements to a gathering in person (or electronically) of a majority of the elected officials, which provides a workable bright-line rule that allows elected officials to prepare for open meetings in smaller private groups.

Other jurisdictions resoundingly reject the majority's interpretation. As the majority notes, in our 1980 decision in *Telegraph Herald*, we surveyed cases construing similar "sunshine laws" to conclude such laws do not apply to gatherings of less than a majority. 297 N.W.2d at 533–34 ("Any other rule would hamstring the progress of governmental bodies[] and impose intolerable time burdens on unpaid officeholders."). Courts continue to reach the same conclusion. *See, e.g.*, *Slagle v. Ross*, 125 So. 3d 117, 124 (Ala. 2012) (holding "a 'meeting' occurs when a majority of the members of a governmental body *come together at the same time*" (emphasis added)); *Del. Solid Waste Auth. v. News-Journal Co.*, 480 A.2d 628, 635 (Del. 1984) (holding the Open Records Act does not apply to standing committees because such a meeting could not be a quorum under the statute); *Dillman v. Trs. of Ind. Univ.*, 848 N.E.2d 348, 351 (Ind. Ct. App. 2006) (holding that the plain meaning of "meeting" requires a majority of people present at the same time); *Willems v. State*, 325 P.3d 1204, 1209 (Mont. 2014) ("[T]he definition of 'meeting' does not include 'serial one-on-one discussions.' ");

*City of Elkhorn v. City of Omaha*, 725 N.W.2d 792, 806 (Neb. 2007) (declining to apply open meetings law to nonquorum government subgroups); *Dewey v. Redevelopment Agency of Reno*, 64 P.3d 1070, 1077–78 (Nev. 2003) (holding that "back-to-back briefings" by members of a government agency did not "create[] a constructive quorum or serial communication in violation of" Nevada's open meeting law); *Citizens Alliance for Prop. Rights Legal Fund v. San Juan County*, 359 P.3d 753, 762 (Wash. 2015) (en banc) ("We see no reason to depart from our long-standing rule requiring the presence of a simple majority of a governing body's members—a rule that provides clear guidance to public agencies regarding the application of the [open meetings act].").

These appellate courts confront the practical problems our majority opinion glosses over—that its interpretation will chill necessary and appropriate private consultations by public officials that precede open meetings. The Delaware Supreme Court noted the open meetings law shows

> a legislative recognition of a demarcation between the public's right of access and the practical necessity that government must function on an orderly, but nonetheless legitimate, basis. The legislature has thus recognized that literal enforcement of the sunshine law at the standing committee level could so disrupt the orderly function of the Authority as to defeat the basic purposes for which it was created. The gathering of information and the free exchange of ideas should not be hampered at the outset, and thus dampen a careful examination of potentially controversial matters, before the Authority can even function. Certainly this does not rise to the level of "closed door" government. The public's right of access at later stages in the decisionmaking process, and its accompanying right to question, is a strong safeguard that public servants remain accountable to the citizens. Any interpretation of the Act beyond its obvious purpose and intent could bring the wheels of government to a halt.

*Del. Solid Waste Auth.*, 480 A.2d at 635 (citation omitted).  More recently, the Nebraska Supreme Court aptly observed the open meetings law

> does not require policymakers to remain ignorant of the issues they must decide until the moment the public is invited to comment on a proposed policy.  The public would be ill served by restricting policymakers from reflecting and preparing to consider proposals, or from privately suggesting alternatives.  By excluding nonquorum subgroups from the definition of a public body, the Legislature has balanced the public's need to be heard on matters of public policy with a practical accommodation for a public body's need for information to conduct business.

*City of Elkhorn*, 725 N.W.2d at 806 (citation omitted).   The majority simply ignores these well-reasoned decisions.

We have never held that an administrator acting as an agent for a board member can be counted to reach a majority that triggers the requirements of chapter 21.   Iowa law distinguishes between elected supervisors and administrators employed by the county.   I would not count an unelected administrator as a stand-in for an elected supervisor regardless of whether he or she is engaged in shuttle diplomacy between supervisors.   The majority's new agency theory rests on a legal fiction that treats the county administrator as a supervisor.   The agency theory conflicts with our precedent limiting the ability of supervisors to use agents.   As the majority recognizes, it is a general principle that public board members "may authorize performance of ministerial or administrative functions" but cannot delegate "matters of judgment and discretion."   *Bunger v. Iowa High Sch. Athletic Ass'n*, 197 N.W.2d 555, 559–60 (Iowa 1972).   The principle that an elected county supervisor cannot delegate matters of judgment *precludes* the legal conclusion that Administrator Furler, who is not a supervisor, could act as one.   Obviously, an administrator could not stand in for a supervisor to vote at

a public meeting. So how could she act as a supervisor privately to trigger chapter 21?[5]

The majority cites two open meetings cases in support of its agency theory: *Claxton Enterprise v. Evans County Board of Commissioners*, 549 S.E.2d 830, 834–35 (Ga. Ct. App. 2001), and *State ex rel. Newspapers, Inc. v. Showers*, 398 N.W.2d 154, 164–65 (Wis. 1987). Neither case supports the majority. The reference to proxies in *Showers* is dicta because the plaintiffs "conceded the four Commissioners did not have the proxies of any other member of the Commission." 398 N.W.2d at 157. The holding of *Claxton Enterprise* contradicts the majority's interpretation. *See* 549 S.E.2d at 835 ("Because this meeting occurred between the county administrator and the commissioners individually,

---

[5]The majority's agency theory not only is at odds with the nondelegation principle noted in *Bunger* but also conflicts with well-established authority that the apparent authority doctrine cannot be used against a local government entity or official. *See, e.g.*, *City of Norwalk v. Conn. State Bd. of Labor Relations*, 538 A.2d 694, 697 (Conn. 1988) (holding that a municipality may not be bound to an agreement under apparent authority because "[e]very person who deals with [a municipal corporation] is bound to know the extent of its authority and the limitations of its powers" (quoting *John J. Brennan Constr. Corp. v. Shelton*, 448 A.2d 180, 185 (Conn. 1982))); *Patrick Eng'g, Inc. v. City of Naperville*, 976 N.E.2d 318, 330 (Ill. 2012) (noting that "Illinois courts . . . have never held that apparent authority may apply against municipalities" and discussing the public policy reasons therefor); *Potter v. Crawford*, 797 A.2d 489, 492 (R.I. 2002) ("[T]he authority of a public agent to bind a municipality must be actual . . . [and] any representations made by such an agent lacking actual authority are not binding on the municipality." (quoting *Casa DiMario, Inc. v. Richardson*, 763 A.2d 607, 610 (R.I. 2000))); 10 Eugene McQuillin, *Municipal Corporations* § 29:21, at 419–20 (3d rev. ed. 2009) (collecting cases). Under *Bunger*, Administrator Furler as a matter of law lacked authority to vote for the reorganization. *See also Dillon v. City of Davenport*, 366 N.W.2d 918, 923–25 (Iowa 1985) (enforcing city's settlement within actual authority extended to its attorney while determining that insurance term beyond his authority "must be deleted from the settlement agreement"). The foregoing authorities make clear that the apparent authority doctrine cannot be used to create such authority. Thus, Administrator Furler cannot be deemed to be a supervisor's agent or proxy to trigger the open meeting requirements of chapter 21. I fear today's majority decision—which distorts basic principles of municipal law—will have unintended consequences.

over a period of time, and at no particular place, the trial court properly found that the Board did not violate the Act . . . .").

The majority's agency theory has not been adopted by any other appellate court interpreting equivalent sunshine laws. Perhaps for that reason, the plaintiffs in this case did not argue an agency theory in district court or on appeal. Nor did their pleadings allege Administrator Furler acted as an agent or proxy for any supervisor.[6] Rather, the agency theory appears for the first time in this case in the amicus curiae brief filed by the Iowa Newspaper Association and Freedom of Information Council.

Not only is the agency theory a misreading of chapter 21, I would hold that the theory was not preserved. We have repeatedly held that amici cannot preserve issues for a party or raise new issues on appeal. *Press-Citizen Co. v. Univ. of Iowa*, 817 N.W.2d 480, 493–94 (Iowa 2012) ("Although this argument is developed at some length in the brief of the amici, it was not raised below or by the Press-Citizen. We therefore decline to reach it."); *see also Rants v. Vilsack*, 684 N.W.2d 193, 198–99 (Iowa 2004) (declining to reach an argument raised by amici curiae that was not presented to the district court); *Mueller v. St. Ansgar State Bank*, 465 N.W.2d 659, 660 (Iowa 1991) (noting that "[u]nder Iowa law, the only issues reviewable are those presented by the parties"). The majority fails to explain why the same rules do not apply here.

Plaintiffs are not entitled to a retrial because they never raised or otherwise preserved an agency or proxy theory in district court. The existence of an agency relationship and the extent of the agent's

---

[6]If the agency theory had been raised in district court, the defendants would have had the opportunity to respond and rebut it with testimony on Administrator Furler's actual authority, or lack of it.

authority are questions of fact. *St. Malachy Roman Catholic Congregation of Geneseo v. Ingram*, 841 N.W.2d 338, 347 (Iowa 2013) ("Whether the agency exists and its extent are questions of fact." (quoting *Fowler v. Berry Seed Co.*, 248 Iowa 1158, 1165, 84 N.W.2d 412, 416 (1957))); *see also Peak v. Adams*, 799 N.W.2d 535, 546 (Iowa 2011) (stating that "[a]gency is generally a question of fact" and reversing a summary judgment on an agency issue). The district court made no finding that Administrator Furler acted as an agent for any supervisor. Rather, the district court found each supervisor retained his authority to approve or veto the reorganization while Administrator Furler merely acted as a "conduit" between them. A conduit who relays information differs from an agent with authority to negotiate policy decisions for her principal, as Justice Mansfield explains today in his separate dissent, which I join. The district court never found that Administrator Furler was authorized to act in the place of one supervisor when she met with another. Nor can the court's actual findings be interpreted to include an implicit finding of agency. Appellate courts may only use implicit findings to *affirm* a judgment. *See Diercks*, 806 N.W.2d at 654–55 ("We assume the district court implicitly found the facts necessary to support the fee award, including that the City did not litigate in good faith."); *Gray v. Osborn*, 739 N.W.2d 855, 861 (Iowa 2007) (holding ambiguous findings "will be construed to uphold, not defeat, the judgment" (quoting *Johnson v. Kaster*, 637 N.W.2d 174, 177 (Iowa 2001)); *City of Des Moines v. Huff*, 232 N.W.2d 574, 576 (Iowa 1975) ("In review of any case tried to the court at law, findings of the trial court are to be broadly and liberally construed, rather than narrowly or technically, and in case of ambiguity, they will be construed to uphold, rather than defeat, the judgment."). We have never used implicit findings to *reverse* a judgment.

The majority makes too much of the district court's conclusion that the supervisors "deliberated" by using Administrator Furler as a conduit. Individual supervisors deliberated separately with Administrator Furler communicating between them.[7] The district court never found that Administrator Furler deliberated in the place of a supervisor; rather, Administrator Furler relayed information between them. Administrator Furler's deliberations are not those of a supervisor. Missing is the requisite real time temporal proximity for the supervisors' private deliberations, as well as the requirement that two *supervisors* meet in person. The district court expressly found the meetings between Administrator Furler and individual supervisors did not trigger chapter 21.

We do not apply de novo review to fact-finding in an action to enforce chapter 21. Rather, as the majority acknowledges, we review actions to enforce the open meetings law as ordinary, not equitable, actions. *Schumacher v. Lisbon Sch. Bd.*, 582 N.W.2d 183, 185 (Iowa 1998). Accordingly, "the trial court's findings are binding here if supported by substantial evidence." *Tel. Herald*, 297 N.W.2d at 533. Most importantly, as an appellate court, we are "not free to substitute [our] own findings of fact for those of the district court.*" Walsh v. Nelson*, 622 N.W.2d 499, 502, 504 (Iowa 2001) (vacating fact-finding by court of appeals). Today's departure from our precedent is all the more egregious because the majority reverses the district court to grant a new trial under a fact-bound theory the plaintiffs never raised. Giving the plaintiffs a

---

[7]Deliberate means "to ponder or think about with measured careful consideration and often with formal discussion before reaching a decision or conclusion" or "to ponder issues and decisions carefully often with the aid of counsel and formal consultation . . . THINK." *Webster's Third New International Dictionary* 596 (unabr. ed. 2002). These definitions make clear that a person can deliberate alone.

second bite at the apple under these circumstances is unfair to the district court judge and to the defendants. Our practice until now has been that new liability rules are applied prospectively and in pending appeals *in which the issue had been preserved. See, e.g., Goetzman v. Wichern*, 327 N.W.2d 742, 746, 754 (Iowa 1982) (applying a new rule when plaintiff had preserved error and to future trials and to "all pending cases, including appeals, in which the issue has been preserved"), *superseded on other grounds by* Iowa Code ch. 668, *as recognized in Berry v. Liberty Holdings, Inc.*, 803 N.W.2d 106, 111 (Iowa 2011); *cf. Sechler v. State*, 340 N.W.2d 759, 761–62 (Iowa 1983) (declining to apply *Goetzman* rule in pending appeal because plaintiff had failed to preserve error on that issue). I would affirm the district court judgment without a retrial.

Finally, while remanding this case, the majority misses the opportunity to provide meaningful guidance on how to apply the balancing test set forth in Iowa Code section 21.6(3)(*c*). That provision expressly requires the court to "void any action taken in violation of this chapter" unless the court affirmatively finds "the public interest in the enforcement" of the open meetings law "outweighs the public interest in sustaining the validity of the action taken in the closed session." *Id.* If defendants indeed violated the open meetings law, why not declare the illegally consummated reorganization void and reinstate the terminated employees? The majority, however, citing a single inapposite decision from Vermont,[8] gratuitously suggests that violations of chapter 21 can be

---

[8]The majority cites *Valley Realty & Development, Inc. v. Town of Hartford*, 685 A.2d 292, 296 (Vt. 1996). That decision applied a statutory remedy provision unlike Iowa's to an evidentiary record bearing little resemblance to this Iowa litigation. Specifically, a real estate developer sought a refund of sewer fees on grounds that the town had acquired land seven years earlier for the sewage treatment facility allegedly in

cured simply by ratifying the challenged actions at an open meeting. If so, the majority has substantially weakened the enforcement mechanisms for the open meetings law.

For these reasons, I respectfully dissent.

Mansfield and Zager, JJ., join this dissent.

---

violation of Vermont's open meetings law. *Id.* at 293. The Vermont statute allowed for " 'appropriate injunctive relief or for a declaratory judgment' at the request of the attorney general or a person aggrieved by the violation of the open meetings law." *Id.* at 294 (quoting Vt. Stat. Ann. tit. 1, § 314(b)). The Vermont Supreme Court expressly noted the "remedy provision of the open meeting law does not provide that actions taken in violation of the law are void." *Id.* Rather, the statute provided that no action "shall be considered binding except as taken or made at such open meeting." *Id.* (quoting Vt. Stat. Ann. tit. 1, § 312(a)). The court concluded that provision allowed subsequent ratification of the property acquisition at an open meeting. *Id.* at 295–96. By contrast, the Iowa statute provides that the court "[*s*]*hall void* any action taken in violation of this chapter" if the suit is filed within six months and the public interest in enforcing the open meetings law outweighs the public interest in the validity of the action. *See* Iowa Code § 21.6(3)(*c*) (emphasis added). Moreover, the Vermont court noted "there is no indication . . . the land purchase decision [seven years earlier] was controversial or that citizens who wanted to comment on it were excluded from the decision-making process." *Valley Realty*, 685 A.2d at 295. Indeed, the plaintiff had no "debate with the Town's decision to buy the . . . property or its plans to expand the sewage treatment facility." *Id.* By contrast, the Warren County reorganization was timely challenged within thirty days by the plaintiff employees who had been terminated by highly controversial decisions allegedly made behind closed doors in violation of Iowa's open meetings law. Thus, *Valley Realty* is legally and factually inapposite. The majority's failure to clarify the balancing test virtually guarantees another appeal in this contentious litigation if the district court on remand finds the Open Meetings Act was violated, while attorney fees for both sides continue to mount.

**MANSFIELD, Justice (dissenting).**

I join Justice Waterman's dissenting opinion. I write separately to discuss the majority's blurring of concepts regarding the law of agency.

To say that an individual may be an agent merely begins the analysis. We need to consider the *scope* of that person's agency. *See In re Estate of Waterman*, 847 N.W.2d 560, 574–75 (Iowa 2014). In particular, what was the agent's authority?

The record supports the conclusion that Administrator Furler was *one* kind of agent. That is, she had authority to carry messages from one supervisor to another. This fact, however, does not establish that a quorum of the supervisors ever held an illegal meeting. As the statute provides, *see* Iowa Code § 21.2(2), and as we stated in *Telegraph Herald, Inc. v. City of Dubuque*, 297 N.W.2d 529, 532 (Iowa 1980), a meeting "requires a gathering (in person or by electronic means) of a majority of the members of a governmental body." Serial communications, whether the courier happens to be the mail, a carrier pigeon, Pony Express, or Administrator Furler, do not violate the open meetings law.

A different question would be presented if Administrator Furler were *another* kind of agent—that is, if she were empowered with decision-making authority. For example, if one of the supervisors delegated to her the authority to work out a restructuring plan with another supervisor, this would be more problematic. In that case, Administrator Furler would be a *proxy* rather than a *conduit*.

This distinction is just a matter of common sense. For example, there is a big difference between a baseball team owner telling the general manager to offer a specific salary to a specific free agent and the

owner giving the general manager permission to sign free agents for the betterment of the team.

Despite this important distinction, the majority confuses the matter by treating all agencies as if they were identical and using the terms agent, conduit, and proxy interchangeably. As discussed above, a conduit and a proxy are both agents, but they differ as to the scope of their authority. Here the district court found that Administrator Furler was a "conduit" or "messenger." The court did not find that she was a "proxy," nor was such a theory tried. Hence, the court correctly found no violation of the open meetings law.

In my view, our legislature made a logical decision when it allowed members of state and local boards and governing bodies to communicate privately in advance of public meetings, so long as the communications do not amount to a real-time meeting. It is inherently difficult for decision-making bodies to do all of their business in public. This observation holds true whether the body is a board of supervisors, a legislature, an appellate court, the board of directors of a charity, or the management of a news media organization.

For these reasons, as well as those stated by Justice Waterman, I would affirm the district court.

Waterman and Zager, JJ., join this dissent.